*J. Petitt* and *S. Huff,* for the appellee.

May Term,
1851.

CARTER
v.
THE STATE.

---

## CARTER v. THE STATE.

An indictment charging the defendant of murder by administering poison, need not state the particular poison administered; and if it do so state, it will not be necessary that the proof correspond.

If the offence is punishable by a single statute only, and the conclusion of the indictment is against the statutes, the conclusion will be considered good.

The Court permitted the state to prove that it was the popular opinion that ergot would produce abortion. The evidence showed that ergot was administered to the deceased shortly before her death. *Held,* that the fact proved might show a motive for administering it, and the intention with which it was done, and hence was admissible.

Medical books are not admissible as evidence, but medical men may give their opinions as witnesses, which opinions may, in a measure, be founded on the contents of standard medical books as a part of their general knowledge.

The Court instructed the jury that they were the judges of the law and the facts; but that it was their duty to believe the law as laid down by the Court. *Held,* that the instruction was right.

ERROR to the *Franklin* Circuit Court.

PERKINS, J.—This was an indictment against *William Carter,* containing two counts. The first charged him with the murder of *Marilla Reed.* The second charged him with administering to said *Marilla* "divers deadly and noxious drugs and poisons, with the intent then and there

2  617
157  528

Tuesday,
June 10.

to procure the miscarriage of the said *Marilla Reed*, and willfully and feloniously," &c., " to kill and murder the child of which she was pregnant; by means whereof the said *Marilla* became diseased; and of which disease she languished and died." The defendant was convicted upon the second count and sentenced to the state prison. It is sought to reverse that conviction upon several grounds.

1. The indictment did not name the particular poison administered.

Had it, it would not have been necessary that the proof should correspond. 3 Chit. Cr. L. 734. The allegation in the indictment would, therefore, seem to be unnecessary. *State* v. *Vawter*, 7 Blackf. 592.

2. The indictment concluded against the *statutes*, when, it is insisted, it should have concluded against the *statute*.

The authorities are not uniform upon this point, and the objection is one not to be favored. In *United States* v. *Gilbert et al.*, Mr. Justice *Story* says, " And I am also of opinion that if the offence was punishable by a single statute only, and the conclusion [of the indictment] was against the form of the statutes (in the plural) that it would, in point of law, be a good conclusion. I am aware that there is some diversity of opinion in the books on this point, but having had occasion many years ago, in *Kenrick in error* v. *United States*, 1 Gallis. R. 268, to consider the question with great care, that was the conclusion to which my judgment deliberately led me; and I have since seen no occasion to change it upon principle or authority." The Supreme Court of *New Jersey*, in *Townley* v. *The State*, 3 Harri. 312, ruled the point the same way, and our views accord with those decisions.

3. The Court permitted the state to prove that it was the popular opinion that ergot would produce abortion.

To this the defendant objected. It is probable, as will appear from the evidence given below, that ergot was administered to Mrs. *Reed* shortly before her death. The fact proved might show a motive for administering it, and the intention with which it was done, and hence, we think, was admissible.

4. The Court also permitted medical witnesses, on the part of the state, to testify as to the effects of poisons upon the human system, from information derived from the writings of standard authors on the subject.

The defendant objected, insisting that the authors themselves should be produced as witnesses, or, if dead, that then their books should be read. In *Collier* v. *Simpson*, 5 C. & P. 73, it is held that medical books are not admissible evidence; but that medical men may give their opinions as witnesses, which opinions may, in a measure, be founded on the contents of standard medical books as a part of their general knowledge. 1 Greenl. 595, n. 3.

5. The Court instructed the jury that they were the judges of the law and the facts; but that it was their duty to believe the law to be as laid down by the Court.

Taken all together, we think the instruction expresses the law. It informs the jury that it is in their power to find a general verdict of guilty or not guilty, as they please, upon the whole case, and at the same time admonishes them that duty dictates that they should take the law from the Court. It is unnecessary for us to enter upon an elaborate argument and review of authorities on this question to vindicate our conclusion. In the cases of *Pierce* v. *The State*, 13 N. H. R., and *Commonwealth* v. *Porter*, 10 Met. 262, every thing is said upon the subject that needs be said, and the whole current of decision is almost unbroken on the point. The authorities are examined in the cases cited.

6. It is objected that the verdict of guilty was not justified by the evidence.

It remains but to consider this objection. In *March*, 1849, *Henry Reed*, then the husband of said *Marilla*, left this state for *California*, leaving behind him, residing on *Duck* creek in *Franklin* county, his wife and four children, the oldest about seven years, and the youngest about one year of age. Their house had but one room in which the family ate and slept. It contained three ordinary beds and one trundle bed. Five weeks after Mr. *Reed's*

May Term, 1851.

CARTER
v.
THE STATE.

departure, *Carter* commenced boarding with Mrs. *Reed*, and was her only boarder till the first of *September*, when, there being talk about them in the neighborhood, Mrs. *Reed* concluded to take other boarders also. *Garrison* and *Hellen* then commenced boarding with her. *Garrison* says he was there three weeks. Saw no particular intimacy between *Carter* and Mrs. *Reed ; Carter* was on more confidential terms with her than witness was. *Hellen* says, I remained there till the *Saturday* before she died. Mrs. *Reed's* health was good till about three weeks before her death. About that time, I came home from my mill on one occasion near midnight. Soon after I went to bed Mrs. *Reed* got up, went out of the door, and vomited. Next morning was unable to prepare breakfast. I then boarded elsewhere a week. When I returned she was well and doing her work; her mother had been there; I heard no more complaint till I left finally the *Saturday* night before she died. She was then in good health. *Carter* had told her that I should not remain; or, if I did, he would not. She told me afterwards, during that week, that she could not board me any longer, and on *Saturday* night I settled with her and quit. When I left there was no one about the house but defendant, *Carter*, the deceased, and her children. Defendant appeared to control the house. I never saw any great intimacy between the deceased and *Carter*, or other men. She was pleased to have *Carter* as a boarder. He was kind to her; got her wood, built her fires, &c. I generally stayed at *Laurel* from *Saturday* night till *Monday* or *Tuesday* morning.

The mother of deceased testified that she did not hear of her daughter's sickness till she heard of her death; was 26 years old; always in good health; was well and hearty when her father died, except sore throat, the effect of cold, which she soon got over, and was always hearty afterwards; had sore throat when she had cold; had slight sore throat and sick stomach a few weeks before her death. Witness went to see her. Witness and the sisters of Mrs. *Reed* lived in the vicinity of deceased.

May Term, 1851.

CARTER
v.
THE STATE.

Mrs. *Fitzgerald* was at Mrs. *Reed's* house at sundown the evening before she died. Her face, throat, and arms were "broken out;" she was scratching her arms and throat; throat was red; said she felt as she did when her father died, when she had the scarlet fever; said she spit nothing but blood; had a bowl beside her; did not complain of pain, thirst, or vomiting; looked bad, eyes mixed; witness thought she had the scarlet fever. Mrs. *Reed* said she had made a wash for her throat and it was getting better; did not want a doctor. Going home, witness saw *Carter;* told him he should get a doctor and a girl for Mrs. *Reed;* he said she would not let him.

Mr. *Wiggins* says Mrs. *Reed* was at his house the *Monday*, or *Tuesday*, or *Wednesday* before she died; heard no complaint; she looked well. *Carter* took dinner at witness's house the day of Mrs. *Reed's* death; he said she was very sick; had been sick and vomited hard on *Sunday* morning; had helped to get breakfast one morning afterwards; after dinner, *Carter* went in the direction of Mrs. *Reed's*.

*Jesse Washburn* says, *Carter* called me in as I was passing Mrs. *Reed's* house in the afternoon of the day of her death, about three o'clock; no one there but *Carter*, the deceased, and her children; *Carter* said she was dying; she gasped but once after I entered the house; was lying undressed in bed; breast bare, hair disheveled; face had marks of dirty hands upon it; room unswept; no marks of violence upon deceased; *Carter* said she had complained of sore throat; found what was pronounced arsenic, and also ergot on a shelf in open cupboard in the room; arsenic was in two white papers, open; ergot was in a white paper with a brown paper outside, labelled "1 oz. ergot," tied, but open at one end. Spoke to *Carter* about it on *Saturday;* he said Mrs. *Reed* could not have brought them there, he thought *Hellen* must have done it; declared himself ignorant of Mrs. *Reed's* condition and of the medicines; expressed a willingness to go with me and learn how they came there; said he had given Mrs. *Reed* three sugar-coated pills and some pennyroyal tea,

May Term, 1851.

CARTER
v.
THE STATE.

which vomited her; she wanted cold water; complained of sore throat; had asked him to get breakfast the morning she died, but thought she would be well enough to get dinner. Witness asked *Carter* if he was willing deceased should be opened, and would go for a doctor; he expressed a willingness and went for doctor *Gifford*.

Dr. *Tennis* says, *Carter* came for me to attend *post mortem* examination of deceased; came for Dr. *Gifford* and myself; said I was sent for, as it was suspected by some that Mrs. *Reed* was poisoned, and by others that she was in the family way; that neither was true; he was certain that neither was true. Several times on the road, and again when we arrived at the house, he proposed to me, that if we found anything wrong he would give me 10 dollars if I would not report it; he did not distinguish whether as to poison or pregnancy. Said I would also get the patronage of Mrs. *Reed's* numerous relations by doing so. His manner was uneasy, excited. His proposition was rejected.

Mrs. *Washburn* says, saw deceased before she was cold; hair down, looked as full as in health, and natural, with the exception of froth at her mouth; *Carter* said she had not been sick much; got the sore throat and lay down and died; witness describes arsenic and ergot found as *Washburn* had done; also, saw some ergot in a tin cup, wet; cup had been nearly filled with water, but had none in it then; *Carter* protested his innocence and ignorance of Mrs. *Reed's* pregnancy, and hoped to *God* his arm would drop off if he brought any ergot about the house; witness threw the arsenic into the fire for fear of some one being poisoned with it, and supposing it of no use.

Mr. *Moffitt*, clerk in *Haile's* drug-store, says, at last *February* term of Court (the month in which Mrs. *Reed* deceased), I sold defendant, *Carter*, six or eight ounces of laudanum and one ounce of ergot; he said he was buying them for a midwife; the package of ergot now shown me (having been proved to be the identical one found at Mrs. *Reed's* at her death) is the one I sold *Carter*; it then contained one ounce, and was labelled " 1 oz.

ergot." [When found it contained half an ounce, as proved.]

Mr. *Tatman*, clerk in his brother's drug-store, about three weeks before the death of Mrs. *Reed*, one cold, wet, night, sold *Carter* arsenic, thinks half an ounce; put it up in two white papers; had but one kind of wrapping paper; *Carter* put them in his pocket; witness asked him what he wanted with arsenic; he said, jocularly, it was none of my (witness's) business.

Dr. *Tennis* says, is a physician of between three and four years' practice; was at Mrs. *Reed's Friday, March* 1, 1850, the day after her decease; was called to examine her body; met Doctors *Cain, Conner,* and *McGuire.* Appearance of body healthy; no external marks of disease, or violence; examined stomach, part of bowels, mesenteric glands, and uterus; no part of stomach healthy; dark splotches, some bright red, at cardiac orifice; further down, dark, color of coagulated blood; inflamed, contained about a quart of thick, turbid, dirty-looking liquid, not so bright as brandy; ran out into the cavity of the abdomen; womb healthy, and contained a four or five months fœtus; thinks her death was produced by arsenic; disease, under certain circumstances, might have produced such a condition; could never find such a stomach in so healthy a body; cold water would produce congestion, not corrosion; gastric juice, if in excess, and with nothing else to act upon, might act slightly upon the stomach; I examined the duodenum, part of small intestines, and mouth, not the throat; some redness at mouth; little darkness of the skin under the eyes. It is said that less than two grains of arsenic will produce death in an adult. By a chemical test, examination might have been more conclusive, but I was satisfied.

Doctor *Cain*, a physician of six or or eight years' practice, says, was at *post mortem* examination, did not participate in it; there was no emaciation of the body; looked as if Mrs. *Reed* died in good health; saw the stomach taken out; on inner surface about twelve splotches, size from that of a shot to that of a dime;

inner surface soft and of a brown color, not the state of health; gastric juice might possibly produce that state, but thinks it was produced by poison; arsenic said to produce these effects; arsenic produces thirst, vomiting, (sometimes of blood,) sometimes produces eruptions. Mucous membrane was injured; lower portion of stomach partly sloughed off; examination was not properly conconducted; blood was coagulated.

Doctor *Conner* was *Reed's* family physician; don't know that Mrs. *Reed* was ever sick enough to call a physician; enjoyed good health; was above medium size and corpulent; saw her body little more than an hour after her death; looked well, no marks of disease; appearance natural, body rigid; assisted the next day at *post mortem* examination; no change in her external appearance; stomach seriously diseased; mucous coat partly destroyed; softened, livid, highly inflamed, splotched; that part near pyloric orifice mostly disorganized; foetus four months old; womb healthy; state of stomach did not agree with other appearances of health; thinks Mrs. *Reed* came to her death by a corrosive poison; stomach contained a good deal of gas and dark fluid; condition was not consistent with health for some time before death; a little girl said mother had taken pills; arsenic might affect throat; can't say that it exhibits outward appearance of its presence; thinks gastric juice might soften inner coat of stomach after death; can be no inflammation after death; saw nothing about the room indicating vomiting or purging. [Nor, we remark, did any witness.]

Doctors *Fosdick, Wallace, Peck, Gilchrist*, all concurred in the probability, from the circumstances revealed in the *post mortem* examination, of Mrs. *Reed's* death having been occasioned by poison. All who were asked the question agreed that ergot, in large quantities, is a poison, and probably an abortive, at all events, in persons predisposed to miscarriage. All concurred that the *post mortem* examination in this case was not conclusive of

itself; the state of the stomach might possibly have been produced by something else; such, also, was Doctor *Haymond's* testimony, and that of Doctor *Davis*.

Mr. *Washburn* says, some three or four weeks after Mrs. *Reed* was buried, saw her body taken up out of the grave; her face and ear, one side, were red and fresh, more so than persons in common health; about her nose and mouth was a light blue mould; doctors then took out her stomach, and I took it to professor *Stoddard*, of *Oxford*, *Ohio*, a chemist. It was proved by another witness that the professor had left for the *East* before this trial.

*George Berry* is a physician of sixteen or eighteen years' practice; ergot is administered to assist in expelling the fœtus from the womb, and the placenta after the birth of the child, and used as an emmenagogue, and to check internal hemorrhages. It is a popular notion that it will produce abortion. Is acquainted with the properties of arsenic; it is used as a medicine, and administered internally as a tonic and alterative. When given in excessive quantities it produces great thirst, nausea, vomiting, (sometimes of blood,) purging, cold clammy sweats, darkness around the eyes, inflammation of the whole alimentary canal, and death. These symptoms sometimes vary, all of them, with others, occurring, and sometimes only a part of them. After death, the whole alimentary canal generally exhibits evidences of inflammation having existed; the mucous membrane of the stomach is more or less perforated and covered with red splotches which are to be found in other portions of the alimentary canal, especially that from the stomach upwards. There have been cases of death by poison from arsenic, where the stomach, after death, exhibited no traces of inflammation, although arsenic was found in the stomach; and there have been cases where death resulted from arsenic, in which chemical tests did not give evidences of the use of arsenic. Slight eruptions upon the skin are present during the sickness, but will not be seen after death, except upon very close examination. It resembles the eruptions of miliary fever. The color

of a healthy stomach is that of a mixture of lightish red and white. It is even to the feel, and the mucous membrane is of a velvety appearance, without any portion of it being destroyed. Two grains of arsenic would produce death. It is quite soluble in warm water—not so much so in cold. If the stomach were diseased, the gastric juice would corrode after death, but only in diseased parts. Red splotches, I think, would not be produced by the action of gastric juice on the stomach. Arsenic is a powerful antiseptic, one of the best we know of to preserve animal matter, and is frequently used to preserve corpses from putrefaction. In this climate there is a great tendency to a hasty putrefaction of all animal matter. Under the description given of Mrs. *Reed's* body, I know of no disease, or other cause of her death, so likely as that she died of arsenic—stomach inflamed, no emaciation, three or four weeks after death face of lively appearance. Such appearance not consistent with death from scarlet fever; it would exist under a long scarlet fever, protracted sore throat, &c., running into the typhoid form; not less than fourteen days might produce such a stomach. In simple scarlet fever, party might get about, have a relapse, disease run into the typhoid form, but in such cases there would be a running from the ears, eyes, and nose ; glands about the neck would be swollen. Scarlet fever usually epidemic ; rarely goes into a family without more than one taking it ; are, however, sporadic cases. Children more apt to take scarlet fever ; adults rarely do so, though sometimes do, and die with it ; persons of full habit more likely to die. If the eruption in this fever breaks out, it continues several days, and, if patient likely to die, the discoloration turns pale, or bluish, diarrhœa sets in, and would, should it run for weeks, show an inflamed and diseased stomach. Eruption, in cases of arsenic, occurs, very often suddenly after its exhibition, but generally where the subject lingers. Corrosive sublimate would produce same effect in stomach; cold water would produce, in such cases, congestion, not inflammation. Arsenic is a corrosive poison ; there is a difference of

opinion in the books about this, but in name only. A proper *post mortem* examination would be, to learn what medicines had been used; examine the house for poisons; look at the externals; examine all the internal organs and viscera. To open the stomach and examine it, and partly to open the womb, would not be satisfactory. A physician might thus satisfy himself, but could not satisfy others. An analysis of the contents of the stomach may fail in showing it when there is sufficient other evidence of poison; gastric juice strongest in healthy subjects; powers of digestion strongest when but little fluid; putrefaction very rapid in this country, especially where death happened from an inflammatory disease; in some cases arsenic does not produce vomiting; small doses not so likely to be vomited up as large; strong healthy person might live two or three days without vomiting. Eight or ten years ago, assisted Dr. *Haymond* in *post mortem* examination of Mrs. *Butler*, who was taken sick one night and died the next. She was about five months gone with child, and her stomach was quite much inflamed and diseased; could not tell what produced death; there was no suspicion of poisoning; she was a woman of general good health. She had complained some time, but as she was in the family-way, it was attributed to that, and only simple medicines given.

Such was the evidence, substantially, in the case. We shall not extend this opinion with comments upon it. Nothing that we could say would add to or diminish the clearness of the conviction it forces upon the mind of the guilt of the defendant below. The facts all conspire to support the hypothesis that *Carter* administered, or furnished to be administered, to Mrs. *Reed*, ergot and arsenic, with an illegal purpose, and that her death resulted in consequence. No explanation, no accounting for the circumstances, was attempted which might have laid the foundation for some other hypothesis to which the facts might have been applied.

We have here, the death of this woman, occurring in an unusual manner; the presumption of poison raised

by the *post mortem* examination; the state of preserva-
tion of the body at its exhumation some three or four
weeks after burial; the poisons found in the room of the
deceased in open papers; the fact that they were procured
by *Carter* but a short time previous; his falsehoods in re-
lation to them; the condition of the woman; *Carter's* at-
tempt to bribe the physician; the circumstances under
which *Carter* and this woman were staying together, and
others, all conspiring to one conclusion—that to which the
jury arrived.

*Per Curiam.*—The judgment is affirmed with costs.

*J. Ryman* and *G. Holland,* for the plaintiff.

*J. D. Howland,* for the state.