## The People vs. Delos Carmichael.

Where the defendant was indicted, under the statute, for mingling poison with food, with intent to injure ; — *Held*,

1. The intent to commit an injury, as a means to the accomplishment of another ultimate and main unlawful object, is not, by the existence of such ultimate design, taken out of the operation of the statute :

2. A person who engages in the prosecution of an unlawful design against another, and uses poison to accomplish such design, which, by its natural action, produces a greater injury than he anticipated, is not, by his ignorance of the probable extent of such injury, relieved from criminal responsibility for the act :

3. Wherever there is a positive physical effect produced, and the poison administered operates to derange the healthy organization of the system, temporarily or permanently, there is an injury which, whenever it is reasonably appreciable, may be regarded as within the statute.

Accordingly, where the proof tended to show that cantharides, a poisonous substance, was administered to the prosecutrix, in some raisins, for the purpose of exciting her sexual desires, and thereby enabling the defendant to have illicit intercourse with her, and that severe bodily injury was in fact produced, and the Court was asked to charge the jury, *first*, that if they believed the defendant gave the cantharides with the intent and for the purpose of exciting her animal passions, so that he might the more readily persuade her to have sexual intercourse with him, and with no other intent, they must acquit him; *second*, that before the jury could convict the prisoner, they must be satisfied that he mingled the cantharides with the raisins with the specific intent of doing her some bodily harm, and not for the purposes of seduction; *third*, if the jury believed that the defendant gave the cantharides for the purposes of seduction, that, although the giving it produced severe bodily injury to the prosecutrix, yet the defendant could not be found guilty unless he knew it would produce such bodily harm, and intended such result; — *Held*, That each of these directions was properly refused.†

*Heard January 7th. Decided January 11th.*

Case reserved from the Hillsdale Circuit, on motion for a new trial.

---

\* On a second trial, the prisoner was convicted of murder of the second degree

† See the *Adwards' Case*, next following.

THE PEOPLE *vs.* CARMICHAEL.

The questions presented are fully stated in the opinion of the Court.

*Burt & Maynard,* for defendant:

The intent with which the poison is mingled with food, in order to be a criminal intent within the statute, must be an intent that the poison itself, when taken into the stomach, shall do an injury to the person who takes it. It is not sufficient that it be mingled with food for the sole purpose of accomplishing some ulterior object. While we admit that, if the act complained of had been done for the double purpose of having it cause the complainant some injury when taken into the stomach, and also of enabling the prisoner to have sexual intercourse with her, it would be immaterial whether the intent to injure was the primary or secondary intent, yet we insist that it must have been done either *with the sole intent*, or *with the intent among other things*, that the poison itself, when taken into the stomach, should do her an injury. The intent to injure, within the meaning of the statute, is an intent to do *bodily* harm. — *Sinclair's Case,* 2 *Lew.* 49 (cited in 1 *Russ. Cr. Law,* 733); *Reg. vs. Bowen,* 1 *C. & Marsh.* 149; *Rex vs. Duffin, Russ. & Ry.* 365; *Rex vs. Boyle, Ry. & Moody,* 29; *Reg. vs. Sullivan* 1 *C. & Marsh.* 209; *Rex vs. Akenhead,* 1 *Russ. Cr. Law,* 760; *Rex vs. Holt,* 7 *C. & P.* 518; *Reg. vs. Jones,* 9 *C. & P.* 258; *Rex vs. Howlit,* 7 *C. & P.* 274.

The Court erred in refusing to charge that, before the jury could convict the prisoner, they must be satisfied that he mingled the poison with the raisins, with the specific intent to do the prosecutrix some bodily harm, and not for the purposes of seduction. Seduction being a state prison offense, the attempt to seduce is also of itself an offense under Sec. 11, Chap. 161, of R. S. of 1846.* The prisoner can not be indicted for one offense, and convicted of another.

* Sec. 5947 of Compiled Laws.

If he has committed an offense against the provisions of any statute, it is against the section last cited.

The Court also erred in refusing to charge the jury, if they believed defendant gave the poison for the purpose of seduction, that, although it produced a severe bodily injury to the complainant, yet defendant could not be found guilty unless he knew it would produce such bodily harm, and intended that result. It is not the *act done* that constitutes the offense under this statute, but the *intent* with which it was done.

The Court erred in charging the jury that, if they should find that defendant mingled the poison with the raisins for the purpose of exciting the sexual passions of complainant, in order that he might have sexual intercourse with her, then they should find the prisoner guilty. The intent to injure was for the jury to find, while this charge withdrew that question from their consideration. Mingling the poison with the raisins was in itself an *indifferent* act, and only became criminal if done with intent to injure. The intent charged must therefore be proved, and found by the jury.—3 *Greenl. Ev.* § 13; *Rex vs. Woodfall*, 5 *Burr.* 2667; *Arch. Cr. Pl.* 104; *Cowen & Hill's Notes, Part I., Note* 395; *Reg. vs. Cruse*, 8 *C. & P.* 541; *State vs. Jefferson*, 3 *Harr.* 571.

*J. M. Howard, Attorney General,* for the People:

The sole question is, whether the prisoner mingled the poison in the food, intending thereby to injure the person of the complainant. If its natural effect was in any way to impair her bodily health, or to produce an unnatural and unhealthful action of the intellectual powers, the preparation of it was a crime within the statute. If the effect of the dose was to destroy or impair the safeguards of reason and prudence, and thus expose her to be overpowered by the temptations of crime, it was as great an injury to her as if the prisoner had resorted to personal violence to accomplish his ends.

THE PEOPLE *vs.* CARMICHAEL.

It is the effect of the poison upon the person, and not the opportunity or advantage apprehended from that effect, that characterizes the intent. If that effect be injurious to the person, the Court need take no notice of the remote consequences to which it may lead. They may or may not be criminal, according to their legal character. It is immaterial what was the "sole" or "specific" intent of the accused, in administering the poison—it is sufficient that the means by which he aimed to reach his final object were injurious to the complainant.—See *Gillow's Case*, 1 *Moody C. C.* 85; *Hunt's Case, Ib.* 93; *Cox's Case, Russ. & Ry.* 362.

The Court properly refused to charge that the jury must find that the prisoner *knew* the cantharides would produce bodily harm. It was proved that such was their usual and natural effect, and, that being shown, the *onus* was on defendant to show that such effect was not intended by him. —*People vs. Orcutt*, 1 *Park. Cr. R.* 252.

CAMPBELL J.:

This cause comes before the Court upon reservation, on motion for a new trial, from the Circuit Court for the County of Hillsdale. The questions presented arise upon exceptions taken at the trial.

The defendant was indicted, under Section 27, page 661, of the Revised Statutes,* for mingling a quantity of poison, called cantharides, with food, with the intent to injure one Emily Wakefield. The proof on the trial tended to show that the poisonous substance was administered in some raisins, for the purpose of exciting her sexual desires, and thereby enabling the defendant to have illicit intercourse with her. It further tended to show that severe bodily injury resulted to her from the effects of the poison. The defendant's counsel requested the Court below to charge the jury,—

*First.* That if they believed the defendant gave the cantharides with the intent and for the purpose of exciting

* Sec. 5737 of Compiled Laws.

her animal passions, so that he could the more readily per-suade her to have sexual intercourse with him, and with no other intent, they must acquit him.

*Second.* That before the jury could convict the prisoner, they must be satisfied that he mingled the cantharides with the raisins with the specific intent of doing her some bodily harm, and not for the purposes of seduction.

*Third.* That if the jury believed the defendant gave the cantharides for the purposes of seduction, that, although the giving the cantharides produced a severe bodily injury to the complainant, yet the defendant could not be found guilty, unless he knew it would produce such bodily harm, and in-tended that result.

All these requests the Court refused; and also charged the jury that if they should find the defendant mingled the cantharides with the raisins so given to the complainant, for the purpose of exciting her sexual passions, in order that he might have sexual intercourse with her, they should find him guilty. The defendant excepted to these rulings.

The questions arising for our decision may be conveniently arranged under the following heads:

1. Whether the intent to commit an injury, within the statute, as a means to the accomplishment of another ultimate and main unlawful object, is, by the existence of such ulti-mate design, taken out of the operation of the statute:

2. Whether a person who engages in the prosecution of an unlawful design against another, and uses poison to ac-complish such design, which, by its natural action, produces a greater injury than he anticipated, is, by his ignorance of the probable extent of such injury, relieved from criminal responsibility for the act:

3. Whether the injuries shown in this case are within the statute.

The first and second charges asked by the defendant in the Court below, and the grounds taken in the argument, assume that, inasmuch as seduction, or an attempt at seduc-

tion, may be punished as specific offenses, it follows that when the main ultimate design is to seduce, no indictment can be maintained for unlawful acts done with the intent to aid in carrying out that ultimate design. In other words, the ground is taken that there can exist, at the same time, but one punishable criminal intent, and that intent must be the main and ultimate one.

We have examined the authorities cited, and are unable to draw from them any such conclusion. All that they decide is, that the intent alleged in the indictment must be established. To this doctrine we readily subscribe. But we have not found in them any principle which, in our view, creates any other restriction.

In *Sinclair's Case* (cited from *Russ. on Crimes*, 733) where the defendant was indicted for an attempt to drown, it was held that offense was not made out, because his intent appeared merely to keep off from his landing a boat which was approaching, and the injuries were inflicted on the boat alone, by pushes or blows given in that attempt. No injury was done or offered to the boys in the boat; and the danger of drowning, if it existed, was a result of the injuries to the boat. The case does not seem to us analogous.

In *Rex vs. Duffin*, *Russ. & Ryan*, 365, the finding of the jury expressly negatived the intent charged. And in *Rex vs. Boyce*, *Ryan & Moody*, 29, the special finding was of an intent which was not only not covered by the indictment, but was embraced as creating a distinct offense under the same statute on which the indictment was brought. An inspection of the other cases cited will show that they do not maintain the doctrine contended for. *Regina vs. Sullivan*, 1 *Car. & M.* 209; *Rex vs. Akenhead*, 1 *Russ Cr. Law*, 760; *Rex vs. Holt*, 7 *Car. & P.* 518; *Reg. vs. Jones*, 9 *Car. & P.* 258; and *Rex vs. Howlit*, 7 *Car. & P.* 274; are the other cases cited on this point.

We are not wanting in authority on this point, in cases arising in England under a statute similar to ours. In *Rex*

vs. *Shadbolt*, 5 *Car. & P.* 504, it was held that if a man, with the intent to rob another, should wound him, to enable the assailant to rob the wounded man, he might be convicted of the wounding alone. In *Regina vs. Howell*, 9 *Car. & P.* 437, it was held that rioters might be convicted for attempting to demolish a house, although a part of their design might be to injure a person within it. In *Rex vs. Gillow*, 1 *Moody C. C.* 85, it was held that if a double intent existed to commit two indictable acts, the question which was the principal and which the subordinate intent was immaterial, as a conviction was proper on an indictment for either. The same views are expressed in *Hunt's Case*, 1 *Moody,* 93; *Cox's Case, Russ. & Ry.* 362; *Regina vs. Bowen*, 1 *Car. & M.* 149; *Regina vs. Button*, 11 *Q. B.* 929.

The rule adopted in the latter cases commends itself to our judgment more readily, because of the consequences which would flow from its rejection. A large class of statutory offenses consists of acts done with the ultimate intent to do some mischief, which may or may not be accomplished. The means used are frequently criminal and punishable. Where the ultimate intent is accomplished, that act may be detected and punished. But where it remains incomplete, and the intention rests with the guilty person, it would lead to a great perversion of justice to permit him to show, in defense of an indictment for using the unlawful means, that he had such an ultimate design of perhaps greater atrocity, the evidence of which would not be likely to be proclaimed publicly. Justice certainly requires no such principle to be adopted, and we find no sanction for it in the established rules of law.

We are, therefore, of the opinion, that if the defendant was guilty of the act charged in the indictment, it can make no difference in his favor that he committed it to enable him to seduce the prosecutrix. The second request made to the Court was, therefore, properly refused.

It is insisted, on behalf of the prisoner, that, although

the administration of the poison was followed by severe bodily injury, yet no conviction can be had under the statute, without affirmative proof of the intent; and that, if the prisoner designed to produce one effect, and was not aware that a further and severer injury would ensue, he is not responsible for that injury. No question arises here upon the attempt to excite the passions of the complainant, but it is assumed *that* is no legal injury. That question we shall consider in its place hereafter.

The request made to the Court to charge on this subject, we think was properly refused. The defendant may not have known that the effect would be produced which actually occurred; but it does not follow that he *might* not have known it, or that he should be excused for using the poison, without knowing it. But it does not appear, from the bill of exceptions, that any evidence was offered to show this want of knowledge. Where an unlawful act is done, the law presumes it was done with an unlawful intent. And here the act of administering the poison was unquestionably unlawful. So long as the poison remained in the hands of the prisoner, its mingling being an indifferent matter, no presumption arose against him; but the unlawful act of administering it raised the legal inference that he did it with the intention of producing such effects as would naturally result from its reception. It is unnecessary to decide how far even positive proof that a man was misinformed as to the *degree* of injury likely to arise from the use of any substance would avail him in defense, where he used it designedly for any unlawful purpose. But there can be no doubt that if the direct tendency of any man's willful act is to produce injury, and that injury is in fact produced, the intention is in law deducible from the act itself; and something more than mere ignorance must be shown to relieve him from liability for all the consequences attending an act which he knows to be unlawful.—3 *Greenl. Ev.* §§ 13, 14; *York's Case*, 9 *Metc.* 103.

5 Mich.—B.

The question that next arises is, What is the injury contemplated by the statute? Its language is as follows: "If any person shall mingle any poison with any food, drink, or medicines, with intent to kill or injure any other person, or shall willfully poison any spring, well, or reservoir of water, with such intent, he shall be punished by imprisonment in the state prison for life, or any term of years."

Our attention has not been called to any legal construction given to this language, and we are therefore called upon to give it such an interpretation as seems to us in accordance with its words and design.

Most, if not all, poisons are deadly, if given in considerable doses; and the common understanding of the term "poison" is that it distinguishes substances which are thus fatal from other minerals and drugs. But while fatal in one quantity, a smaller amount often produces injurious effects, varying in degree with the proportion given. The statute, recognizing this, was made to punish, not only the intent to produce death by poison, but also to produce injuries not fatal. And the wide range of punishment, from imprisonment for life to a brief period in the state prison, shows that it was not designed to make any rigid rule as to the degrees of injury, but to leave the whole matter open to a reasonable construction.

The injury referred to must, we think, be such as would be directly, and not secondarily, produced by the poison itself; and this being so, the circumstances attending it are important, as in other cases, to throw light on the intent, and also to graduate the punishment.

In looking into the subject under consideration, we are bound to take notice of such matters as belong to the common stock of ordinary human knowledge and experience, and can not shut our eyes to the current of events about us. There is no need of entering into any scientific discussion upon poisons, but there are facts relative to their use which are familiar to every man of common intelligence.

Poisons are very often administered to produce death; and it is this class of poisoning which is most often brought to the notice of courts. But it is safe to say that poison is given in smaller quantities much oftener than in deadly doses. In this, of course, we leave out of view its innocent use by physicians and other authorized persons. But it is not every administration of poison, with a mere absence of actual guilty intent, that will be excused. It has been held that if a slave, without authority, and with a design to produce harmless sleep, administers laudanum to an infant, and, contrary to her expectations, it causes death, she is guilty of manslaughter.—11 *Humph.* 159. And a person assuming to act as a physician, who obstinately or rashly administers a remedy which he knows, or has reason to believe, is a dangerous one, is liable, however little he may have intended to harm the patient.—*Rice vs. The State,* 8 *Missouri,* 561; *Rex vs. Long,* 4 *C. & P.* 398, 423; *Rex vs. Spiller,* 5 *C. & P.* 333. And our statutes make it a punishable offense for a physician, or any one else, to prescribe any poisonous drug or medicine, while intoxicated.—*R. S. p.* 685, §4. It is obvious that the law does not encourage tampering with such matters, even by physicians and nurses.

The instances of the administration of small quantities of poison, which become known from time to time, are rarely found to have been intended to produce mere physical pain or disability. Occasional instances are reported in the books of the continued administering of minute doses to prolong disease and agony; but experience has shown the most common abuse of poison to consist in its application as an auxiliary to the commission of other crimes. And it is wonderfully adapted to this nefarious purpose. Easily disguised in most kinds of food—capable of producing effects through small quantities—subtle and overpowering in its operation—it may be administered with ease and secrecy, and accomplish every villainous purpose, from inducing sleep and stupor, to insanity, paralysis, and death; and there are no agencies

more difficult of detection. Its abuse, in modern times, has become alarmingly frequent. The greater susceptibility of some persons over others, to be affected by it, renders it still more dangerous. Attempts are often made to murder with it, which fail merely from the miscalculation of the criminal; so that the actual intent is not made to appear by the act itself as heinous as it is in reality. It is the great auxiliary of the worst and most violent offenders.

And the records of our criminal courts have, of late years, shown it to be one of the chief means resorted to for the destruction of female virtue. Hundreds of innocent young women are deceived into entering the dens of iniquity which abound in our cities, under the pretext of honest employment, and awake from their drugged sleep dishonored and ruined. These things were all known when the statute was passed, and known too as the very common effects of these baneful drugs; and they can not be overlooked in any attempt to construe it. These effects are not all directly produced by the use of poison, but without it they would not be brought about in such cases; and, therefore, it becomes necessary to see what part poisons have in producing the combined result. The part which they perform is very important. Their operation is to disable the injured person, and take away the power of resistance. And the injury in each case depends entirely, or nearly so, upon the extent of the danger which presses upon the victim, and the corresponding need of strength to resist it. If the intent be merely to produce sleep, or any other temporary and painless effect, and nothing more, the injury might be very slight, and perhaps too trifling to be worthy of legal consideration; but if stupor, or any other unsound condition is produced, to facilitate personal violence, it becomes a very serious matter. The circumstances attending every forcible assault give it character; and the intent is, according to the claim made by the defendant himself, of the very essence of the injury. To

THE PEOPLE *vs.* CARMICHAEL.

leave a child in the open air in summer may be pleasant and useful; to do so in winter may be murder.

Wherever, therefore, there is a positive physical effect produced, and the poison administered operates to derange the healthy organization of the system, temporarily or permanently, we think there is an injury which, whenever it is reasonably appreciable, may be regarded as within the statute. The circumstances of each case will of course throw light on the criminality of intent, and govern the courts in trial and punishment. The law takes no heed of insignificant trifles, but, above and beyond those, it extends its protection and its penalties.

If other statutes covered analogous offenses, we might hesitate longer upon the proper construction of this law; but as many cases which could hardly have escaped notice are not to be reached unless through this statute, we are not disposed to resort to metaphysical subtleties, to defeat a law which, if severe, is, to the public, benignant and humane in its severity.

The intent of the defendant is, in all the requests to the Court, admitted to have been to excite the sensual desires of the prosecutrix, in order to make her an easier prey to his lust. This was to be effected by poison, which should so work upon her physical system as to excite her passions beyond the control of reason, and, in effect, to produce, if not insanity, the most deplorable effect of insanity, which is the dethronement of reason from its governing power. It seems to us that to hold such an effect to be no injury, would be a mockery of justice.

We are of opinion that the defendant's exceptions are not well taken, and that a new trial should not be granted.

The other Justices concurred.