## DOUGHERTY *v.* THE PEOPLE.

PRACTICE *in cases of criminal abortion. What is for the consideration of the jury.* Upon indictment, under section 42, Criminal Code (Rev. Stat. 202), for administering a noxious or destructive substance or liquid to a woman pregnant with child, with intent to produce miscarriage, whether the substance or liquid is noxious or destructive is a question of fact for the jury.

INDICTMENT *for criminal abortion — description of drug.* In such case it is not necessary to set out in the indictment the kind of drug or liquid administered.

EVIDENCE *as to drug or liquid administered.* And if the drug or liquid administered is described in the indictment, it is not necessary that the proof should correspond with the allegation.

EVIDENCE *as to effect of the potion.* Nor is it necessary that miscarriage should be produced. If the noxious substance or liquid is administered *with intent* to produce miscarriage, the crime is complete.

EVIDENCE *as to power of potion to produce intended result.* Nor is it necessary that the noxious substance or liquid administered should be poisonous, as the term is commonly understood, or that it should be capable of producing miscarriage.

If the substance administered is unwholesome, and may probably occasion injury or derangement of the system to a woman pregnant with child, it is noxious within the meaning of the statute.

PRACTICE — *changing form of instruction.* The refusal to give a proper instruction cannot be assigned for error, when the court gives other

instructions embracing the correct principle embraced in the instruction asked.

EVIDENCE OF CONFESSION — *whether sufficient to establish guilt.* Upon indictment for administering drugs to a woman pregnant with child, with intent to produce miscarriage, confessions of the prisoner to the effect that he gave certain drugs to the woman named in the indictment, and that the effect of such drugs was to make the woman sick, may be sufficient to establish guilt, there being other evidence to prove the fact of pregnancy, and it appearing that about the time of the alleged offense the prisoner inquired of a physician, and of other persons, to ascertain what kind of drug would produce miscarriage.

### *Error to District Court, Arapahoe County.*

Mr. L. C. ROCKWELL and Mr. G. W. MILLER, for plaintiff in error.

Mr. M. A. ROGERS, district attorney, first judicial district, and Mr. CLINTON REED, district attorney, second judicial district, for the people.

BELFORD, J.   The indictment in this case contains three counts.   The first alleges that the defendant, on the 10th day of September, 1870, at the county of Clear creek, unlawfully, willfully and feloniously, did administer to, and cause to be taken by, one Maria Casey, she, the said Maria, being then and there pregnant with child, a large quantity of a certain noxious and destructive substance called boneset, with intent thereby, then and there, to procure a miscarriage of the said Maria, etc.

The second alleges that the defendant, unlawfully, willfully and feloniously, did cause to be taken by one Maria Casey, she, the said Maria, being then and there pregnant with child, a certain noxious substance called boneset, and other noxious and destructive substances, administered to the said Maria by the said Daniel Dougherty, etc.

The third count differs in no important particular from the first.   In the court below the prisoner's attorney moved to quash the indictment, on the ground that boneset was not a destructive or noxious substance within the contemplation of the statute.   This motion was overruled, and this

ruling of the court is assigned for error. We are unanimously of the opinion that the character and capabilities of any drug, specified in an indictment as having been used in the production, or attempted production, of a crime, are questions of fact to be determined by the jury upon the evidence before them. To hold otherwise, would be to require that the presiding judge, in all trials involving charges of poisoning, should be an expert in the science of toxicology, or thoroughly familiar with the active and inert properties of all drugs, herbs or minerals,. which are, or might be, used in the perpetration of a crime.

This, indeed, might be regarded as a very onerous requirement, and yet, if of easy fulfillment, would certainly be open to the objection that the judge would thereby become master both of the law and the fact. Independent of this, however, we are of the opinion that an indictment which follows the language of the statute is sufficient.

In the case of *Curtis* v. *The State*, 2 Ind. 618, the court say, that it is not necessary to name the kind of drug, and if it is named, the proof need not correspond. See, also, *Vawter* v. *The State*, 7 Blackf. 592 ; and *Crichton* v. *The People*, 6 Park. Cr. 369. In the case of *Rex* v. *Philips*, 3 Camp. 73, the defendant was charged with administering to a pregnant woman a decoction of a certain shrub called savin. On the trial the prisoner's counsel objected, that, unless the shrub shown in the evidence was savin, there was no evidence that the mixture was "noxious and destructive." LAWRENCE, J., said : "In an indictment on this clause of the statute, it was improper to introduce these words ; and although they are introduced, there is no necessity to prove them. It is immaterial whether the shrub was savin or not." We think there was no error in the overruling of the motion to quash.

The section of the statute on which this indictment is founded reads as follows : "Every person who shall willfully and maliciously administer, or cause to be administered to or taken by any person, any poison or other noxious or destructive substance or liquid, with intention

to cause the death of such person, and being thereof duly convicted, shall be punished by confinement in the penitentiary for a term not less than one year and not more than ten ; and every person who shall administer or cause to be administered or taken any such poison, substance or liquid, or who shall use or cause to be used any instrument, of whatever kind, with intention to procure the miscarriage of any woman then being with child, and shall thereof be duly convicted, shall be imprisoned for a term not exceeding three years in the penitentiary, and fined in a sum not exceeding one thousand dollars.  And if any woman, by reason of such treatment, shall die, the person or persons administering, or causing to be administered, such poison, substance or liquid, or using or causing to be used any instrument aforesaid, shall be deemed guilty of manslaughter," etc.  Crim. Code, § 42.  From an examination of this section, it will be observed that the first clause applies to cases of poisoning as popularly understood ; that is, to cases when a person, desirous of destroying the life of another, willfully and maliciously administers the poison or other destructive substance, against the consent of the person taking the same.  For instance, when a servant girl, designing and intending to take life, should place arsenic in coffee ; and the words "malicious" and "willful" applies to poisonings of this kind, and not to cases of abortion.  The next clause applies purely to cases of the nature of the one undergoing investigation.

The acts sought to be prohibited and the crime sought to be punished, are the using of noxious substances, or instruments with intent to produce miscarriage.  It is not necessary that the miscarriage should take place — that is, that the administering of the drugs or the use of the instrument should be followed by the expulsion of the fœtus.  That is not necessary to constitute the crime.  It is the *administering* the noxious substance or the use of the instrument with intent to produce miscarriage that makes up the crime — and as to the intent, it may be remarked that it is a well-settled rule of law that a sane man, a voluntary agent, act-

ing upon motives, must be presumed to contemplate and intend the necessary, natural and probable consequences of his own acts. If, therefore, one voluntarily or willfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is, that he intended so to destroy such life. So, if the direct tendency of the willful act is to do another some great bodily harm, and death in fact follows as a natural and probable consequence of the act, it is to be presumed that he intended such consequences, and he must stand legally responsible for them. So when a physician inserts into the womb of a woman pregnant with child, instruments calculated to produce irritation and serious derangement of the female economy, and abortion follows, the intention to produce that result is a necessary conclusion from the act. So where drugs regarded as abortives are administered to a pregnant woman whose general health is good and requires no medicine, and said drugs so administered are calculated to produce serious disturbance in her system, and miscarriage is thereby superinduced, it may be presumed that the drugs so applied were designed and intended to produce that result. The intention may be rightly inferred from the character of the means employed. We have said thus much as preparatory to the consideration of the instructions given by the court below to the jury, and which are assigned for error. Over the prisoner's objection, the court gave the following instructions: "If the jury believe from the evidence that the prisoner administered or caused to be taken by Maria Casey, named in the indictment, any noxious or destructive substance or liquid with intent to procure a miscarriage of said Maria Casey, then the jury should find the said defendant guilty. It must appear, however, in order to such conviction, not only that the prisoner gave such drug, or substance, or liquid, but that it was actually taken into the person of said Maria Casey. It will suffice, however, that prisoner procured and gave the drug or substance to said Maria with the intent named, and that she afterward took and swallowed such drug or substance, or some portion

of it.   And it is not necessary in order to be noxious and destructive, within the meaning of the statute, that such drug should be poisonous, as the term is commonly understood, or should be capable of actually producing the miscarriage.   It will be sufficient if, upon the consideration of all the testimony, it shall appear to the jury that such drug, so administered (if any), is unwholesome and might probably occasion injury or derangement of the system to a woman pregnant with child."

In determining the correctness of this instruction it must be borne in mind that the act of miscarriage is not necessary to the gist or completeness of the crime.   The crime sought to be punished is the administering of a poison, or noxious or destructive substance or liquid, with the *intent* to produce miscarriage.   A person indicted under a statute for administering a drug, or doing some other like act, with intent to procure an abortion, may be convicted, not alone, when the proofs show an unsuccessful attempt, but equally when they show an attempt successful; that is, show an abortion actually committed.   2 Bishop's Crim. L., § 10. What then is a poisonous, noxious and destructive substance in the contemplation of this act?   A poison is commonly defined to be a substance which, when administered in *small quantity*, is capable of acting deleteriously on the body ; and, in popular language, it is confined to substances which destroy life in small doses.   It is obvious, says a learned writer, that the above definition is too restricted for the purposes of medical jurisprudence.   It would, if admitted, exclude a large class of substances, the poisonous properties of which cannot be disputed, as for example the salts of copper, tin, zinc, lead and antimony, which, generally speaking, act only as poisons when administered in large doses.   A person may die either from a large dose given at one, or from a number of small doses given at such intervals that the system cannot recover from the effects of the one, before another is administered.   Some substances, such as nitre, have not been known to act as poisons, except when taken in large doses, while arsenic acts as a poison when

taken in small quantities. But, in a medico-legal view, whether a person die from the effects of half an ounce of nitre, or two grains of arsenic, the responsibility of a person who criminally administers the substance is the same. Each substance must be regarded as a poison, differing from the other only in its degree of activity, and, perhaps, in its mode of operation. The result is the same; death is caused by the substance taken, and the quantity required to destroy life or produce any other hurtful result, cannot, therefore, be made a ground for distinguishing a poisonous from a non-poisonous substance. It cannot be doubted that the definition of poison, above given, sprung out of a desire to get rid of the difficulty that would necessarily be encountered in separating a class of poisons from bodies which are generally reputed inert, and which, under certain conditions, are capable of producing the most serious mischiefs.

Medical practitioners would hardly be ready to admit that common salt, an article of constant domestic use, can be so administered as to become as deleterious and destructive to the functions of life as strychnia. An instance of common salt having caused death occurred in 1839. A young lady swallowed a certain quantity for the purpose of destroying worms. It was considered to be a harmless substance according to common notion, but in the course of a few hours some alarming symptoms made their appearance, and medical assistance was sent for. She was found to be in a state of general paralysis, and although the stomach pump and other antidotal means were speedily employed, she died in the course of a few hours. This case is deserving of notice from the evidence which it furnishes of the fallacy of the popular doctrine, that what is taken so freely in small quantities with benefit may be taken with equal impunity in large doses. It is of little moment therefore, in medicine or law, whether one grain of one substance or one ounce of another substance be taken, provided the fatal effects be traceable to the action of the particular substance in the body. This is the point to which a medical jurist must direct his attention. It is therefore necessary

to look to the noxious effects produced by particular substances on the system, and the adequacy of these substances to cause death under symptoms of poisoning, rather than to the mere quantities in which they may be taken. The question of what is a noxious or destructive substance most generally arises on charges of attempted abortion. In the case of White, tried in England in 1857, it was proved that the prisoner had administered to the prosecutrix a large dose of a substance, popularly known under the name of hiera-picra. This is a compound of aloes and canella bark. It was admitted to be a proper medicine in small doses, but capable of acting with injurious effects on pregnant females when given in large doses. The prisoner was convicted. In 1842, in England, two men were indicted for causing the death of another by the administration of a destructive substance. On the day laid in the indictment the deceased had drank several pints of beer which it was afterward proved had been drugged with epsom salts. He was seized with violent purging, and died within forty-eight hours. On an examination of the body the lining membrane of the alimentary canal was found inflamed, and there was no doubt that death was owing to the irritant effects of the salt. One of the prisoners was convicted. The quantity of the substance taken in this case could not be ascertained, but there is reason to suppose the dose was large.

Wharton, in his work on Medical Jurisprudence, book 2, section 236, says: "Most authors assert that there are no specific medicinal substances by which abortion can be produced. The only drug which has any claim to be considered as specific in its action upon the uterus is the ergot of rye; savin and oil of tansy are more frequently used than ergot. They have both, unfortunately, a popular reputation as agents for producing abortion. Their action as abortives is solely due to their poisonous properties, since, when given in proper medicinal doses, they are generally aromatic and stimulant. In fact tansy is in common use as an agreeable bitter for promoting appetite. We think, however, that the administration of either of these drugs to pregnant women,

should always be looked upon with suspicion, for we cannot imagine any condition which at this time would require or justify their use." In section 39, he says: "Powerful purgative medicines, such as aloes, julap, croton oil and elaterium given repeatedly, or in doses capable of setting up violent action of the lower bowels, may produce abortion by a secondary action upon the uterus. The same may be said of cantharides and turpentine. All of these drugs are capable of producing a great degree of active congestion and inflammation in the *pelvic viscera*, and, hence, the uterus is not always exempt from their action. It is certain that, in the greater number of cases, when abortives are criminally employed, the life of the mother is more readily sacrificed than that of her offspring."

As the greater number of substances known under the name of medicines may act like poisons, according to the dose or circumstances under which they are administered, and no precise boundary can be laid down, it would seem that the proof of the crime of poisoning should rest upon the *intention* with which the substance is administered and on the effects produced, or on satisfactory evidence that it is capable either of destroying life or causing injury to health. And in deciding this question, we think it would be doing violence to the wisdom of the legislature to hold, that, when they enacted this section, they intended to limit its operation to such substances as in popular conception were regarded as absolutely poisonous. It is clear and unmistakable that the object had in view, in the enactment of the first clause, was the protection of the person from injury ; from stealthy and wicked assaults made by the designing criminal on the life of his intended victim, through the administration of drugs hurtful and ruinous to health and life.

And it is equally clear that, in the enactment of the second clause, they intended specially to protect the mother and her unborn child from operations calculated and directed to the destruction of the one and the inevitable injury of the other. And the spirit and letter of the law are violated

and set at defiance, when a miscarriage is sought to be produced, either by the application or administration of drugs, which act directly and specifically on the womb and thereby superinduce uterine contraction, or by the administration of such drugs as, operating on the general system of the mother, tend to the destruction of her energy and strength and the diminution of her vitality and health and make miscarriage possible, provided always such drugs are administered with the intent to produce miscarriage. *People v. Carmichael*, 5 Mich. 21. In the attempts made at abortion, the health of the mother is more frequently ruined than the life of the child is destroyed, and believing that the legislature in the enactment of this humane law designed to protect both from injury, we believe with the judge who charged the jury below, that "It will be sufficient if, upon the consideration of all the testimony, it shall appear to the jury that such drug so administered (if any) is unwholesome and might probably occasion injury or derangement of the system to a woman pregnant with child." If any doubt could exist as to the correctness of the foregoing views, still the evidence clearly shows that the substance administered by the prisoner, which was a compound of boneset and some other unknown drugs, was a noxious substance. It made the woman sick and injured her back. Taking the hurtful consequences resulting from the administration of it, together with the intent with which it was given, there can be no question that it fell clearly within the meaning of the words "noxious or destructive."

On the trial, the prisoner's counsel asked the court to give an instruction on the subject of reasonable doubt. This instruction was little else than a transcript of C. J. Shaw's definition of reasonable doubt in the celebrated Webster case. The court declined to give this instruction as drawn by prisoner's counsel, but, in lieu thereof, charged the jury that a reasonable doubt is that state of the mind on which, upon consideration of all the facts proved, the jury cannot say I am satisfied of the prisoner's guilt. A reasonable doubt is not a mere conjectural doubt, but one that arises

out of the evidence, by fair inference, upon consideration of all the testimony.

Had the court refused to give the instruction as prayed for by the defendant, and declined to give the jury one on the same subject, it would have been error. The court itself may give instructions. The refusal to give a proper instruction cannot be assigned for error, when the court gives others embracing the correct principle of law involved in the instruction asked. *Bland* v. *People,* 3 Scam. 365 ; 12 Ill. 261 ; 6 Pet. 628.

It is further claimed that the verdict of the jury cannot be sustained, for the reason that no *corpus delicti* is proved. What is the *corpus delicti* in this case? The pregnancy of Maria Casey, and the administration of the drugs by the defendant. It is said, by the counsel for the prisoner, and very justly, too, that confessions made by a prisoner, unsupported by corroborating circumstances, are not, of themselves, sufficient to prove the *corpus delicti.* There should always be something more than a mere naked confession of one accused, to justify a verdict of guilty. The sad examples furnished in judicial annals, should make courts and juries extremely cautious about basing convictions on foundations of this kind alone. We have carefully considered the evidence in this case, and set it out substantially.

The testimony of Harder is as follows : States he had repeated conversations with defendant, in reference to administering drugs to Maria Casey, with the purpose of procuring abortion. The conversation was at my hotel, in the office thereof, in Idaho. The first conversation was had in July, or August, 1870. The defendant applied to me, in July, to know what medicines might be used to procure an abortion. I told him I heard that tansy would do it. He stated to me his object in wanting to know ; did not mention Maria Casey's name.

I told him to marry the girl ; said he would see her in hell first ; he said the girl was pregnant ; he said he had had connection with her not only at that time, but in the spring of 1870.

The next conversation I had with defendant was shortly after; he said he was going to Central City to obtain medicine to procure an abortion; he did not mention the name of Maria Casey; told me that in the spring he had had intercourse with Maria Casey; in all the other conversations he did not mention her by name, but said "she;" part of the time of these conversations Maria Casey was living with defendant's mother; the other part at Lewis'; she, Maria, went to Mrs. Dougherty's house in July; we never talked about any other woman being pregnant, or about abortion in connection with any other woman; he told me he had procured medicine and had given it to Maria, and that she had taken it; that it made her sick at the stomach; that it did not have the desired result; this was in August; at this conversation Maria was living at Mr. Lewis'; defendant said he had been over and given her the medicine; in another conversation defendant told me that Maria was going home with Ed. Bowden; that she fell in the water, and he hoped to God it had knocked the young one out of her. My reason for believing that, in his conversations, he was alluding to Maria Casey are as follows: After Maria left my house he told me he was having connection with her, and in his conversations he told me he used to go in at her window, and that he declined to take her to the dances because he was having carnal intercourse with her.

*Dr. Holland.* Defendant made application to me in reference to procuring abortion; it was the last of August or first of September; he said he had a girl in a fix and he wished to know what to do in order to get rid of it; I told him I could not give him any thing; when I refused he said it was not sure his girl was in the family way, but that she had not had her monthly sickness for two months, and he wanted to know then what it would be best to take to set her in good health; I told him his mother or any other old lady could do as well as I could; know the nature of the drug called boneset; in large doses it is a violent purgative and an emetic; it is peculiar in this respect; it is used by females to make them regular in their monthly periods; it

is peculiar because it both vomits and purges at the same time when taken in large doses, like a person with the cholera morbus; I do not think it has any direct effect on the womb to produce abortion; the profession has no class of medicines that produce abortions, but we receive it as a general law that any thing that disturbs the female economy seriously, while she is pregnant, will produce the death of the child and its expulsion from the womb; this medicine seriously disturbs the female economy; I should be afraid, as a medical man, to administer boneset very largely to a woman with child; any thing that disturbs the economy would be likely to produce abortion, but boneset has no direct tendency specially to that purpose; the administration of boneset, with any other drug, would be likely to increase the tendency of the other drug or substance to produce abortion; boneset is not considered a poison in popular sense, and yet I think an ounce of the leaves would produce abortion; I regard it as I do all other drugs, hurtful and noxious to a certain extent, beneficial in disease, but hurtful in health.

*Mrs. Swartz.* In August or September, the defendant asked me if I knew of any thing by which an abortion could be procured, and told me that Maria Casey was pregnant, and said he was going to get medicine for her to take; he said he was going to Dr. Holland to ask him; he told me that the medicine he gave contained boneset, and the other ingredients he could not remember; he also told me that Maria said the medicines she took hurt her back. He further said: That Maria could take the medicine, or go to hell; this was after he had given her the medicine, which she said hurt her back. I told him Maria told me her back was lame, and he said, that she said it was from the effects of the medicine; he then said, she could take it, or go to hell. This was in August or September.

*Dr. Edmundson.* I was subpœned before coroner's inquest to examine body of Maria Casey; this was in the month of October; made post mortem examination with other physicians. The woman had been pregnant previous

to her death ; know this from the size and shape of the womb, and the marks of after-birth still in the womb ; I should judge she had been pregnant fully four months ; I should judge more, rather than less than that time ; the womb had been deprived of its fœtus before her death ; she must have conceived about four months before her death ; can't say positively how long before her death her womb had been deprived of the fetus, but it was not long, because the womb had not contracted any on itself ; should judge it was not more than two or three days before her death that the womb was deprived of its contents. The post mortem was twenty-four hours after her death.

*Dr.. Justice.* Know the drug called boneset. Don't think it has any quality to produce abortion ; it is not given for that purpose ; it is a domestic remedy, rarely, if ever, prescribed by the profession. I suppose it might be given in poisonous doses ; it might be given in sufficient doses to produce harm ; never heard of its being given to produce abortion ; there are medicines given for that purpose, which have a violent effect on the whole system, or medicines. which operate directly on the womb, and produce a contraction of the womb ; have known an active cathartic to produce that result; boneset is not classed as an active cathartic, in the quantities in which it is usually given ; I can't say what its effect would be in extreme quantities.

*Dr. Williams.* Boneset is given ordinarily as an emetic ; sometimes it acts on the bowels. No record of its having the effect to-produce a miscarriage ; it is a remedy usually applied in domestic practice ; given in large doses it acts freely on the bowels ; don't know of its having properties that would tend to produce miscarriage.

From an examination of the foregoing evidence it will be seen that, in the spring and during the summer of 1870, the defendant Dougherty was having illicit intercourse with Maria Casey. That, in the month of July, he applied to Harder with a view to obtain information that would enable him to produce an abortion. These conversations were

frequent, and made at times when no criminal charge was pending. The declarations of the defendant were neither superinduced by hope of mercy or fear of punishment. True, he was contemplating the commission of a crime, and was endeavoring to obtain information whereby he could perpetrate it. In his conversation with Mrs. Swartz, he declares his intention to consult Dr. Holland, which he afterward did. It further appears that he went to Central City to procure medicine, and afterward stated to Mrs. Swartz that he had given the same to Maria, and that it contained boneset; that it made her sick, but did not produce the desired result. When Mrs. Swartz communicated to defendant the conversation she had with Maria, wherein she stated that the medicines given by Dougherty to Maria had hurt her back, the prisoner remarks, "Yes; Maria told me her lame back resulted from the taking of the medicines, and that she could take the medicines or go to hell." He told Harder that he had procured the medicines and given the same to Maria, and that it made her sick. Then we have the evidence of Dr. Edmundson, who, with other physicians, made a post mortem examination of the body of Maria Casey, and who swears that Maria must have conceived some four months before her death. This took place in October. We then have the fact of pregnancy established by Dr. Edmundson. We have the fact of the administration of drugs by the confession made by the defendant, and by the evidence of Mrs. Swartz. We are of the opinion that the *corpus delicti* is sufficiently shown by the evidence, and we, therefore, will not disturb the verdict on that account. After the most careful and exhaustive examination of the whole case, we are all of the opinion that the judgment below should be affirmed, and it is accordingly so ordered.

*Affirmed.*