John DOE, Appellant (Plaintiff below),

v.

METHODIST HOSPITAL, Lizzie Cameron, Logan Cameron and Cathy Duncan, of whom Cathy Duncan is Sole Appellee (Defendants below).

No. 30S01–9504–CV–420.

Supreme Court of Indiana.

Dec. 31, 1997.

Sean C. Lemieux, Indianapolis, for Appel-lant.

Mark Small, Joseph P. Maguire, Indianap-olis, for Appellee.

### ON PETITION TO TRANSFER

SHEPARD, Chief Justice.

Over the last century, courts and commentators have developed a quadripartite formulation for the tort of invasion of privacy. In this case we consider whether one branch of that tort, public disclosure of private facts, may form the basis of a civil action in Indiana. On the facts of this case, we decline to recognize that it may.

#### Background

"John Doe" appeals the trial court's entry of summary judgment for appellee Cathy Duncan, whom Doe had sued for invasion of privacy. In reviewing a grant of summary judgment we construe the facts and the inferences they support in the light most favorable to the non-movant, in this case Doe. *Bell v. Northside Finance Corp.*, 452 N.E.2d 951 (Ind.1983). Because he lost below, Doe

bears the burden of demonstrating the trial court erred in granting summary judgment. *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258 (Ind.1994).

Doe is a letter carrier for the U.S. Postal Service. In early 1990, he was rushed from his workplace to Methodist Hospital because of a suspected heart attack. During the ambulance ride, he informed the paramedics that he had tested positive for the human immunodeficiency virus (HIV), and they recorded that information in his medical records. Doe had previously disclosed his HIV status to a small circle of close friends and co-workers, but he had not shared that information with his co-workers generally. For several years rumors had circulated in the workplace, sometimes with a negative connotation, that Doe was gay. On that basis alone, some co-workers had speculated that he was HIV positive.

While Doe was in the hospital, co-worker Logan Cameron allegedly checked on Doe's condition by calling his own wife, Lizzie Cameron,[1] who worked at Methodist Hospital. Doe contends that Lizzie reviewed his confidential medical records, discovered he was HIV positive, and disclosed that information to her husband Logan. Doe further alleges that Logan Cameron related the information to some of Doe's co-workers, including Duncan.

Becky Saunders, who was also a letter carrier, stated that Duncan approached her and said: "I heard that [John Doe] has AIDS. Is it true?" (R. at 98.) According to Saunders, Duncan said that she received the information either from someone who worked in a clinic or from someone who knew someone who worked in a clinic. We accept, for the purposes of this appeal, Saunders statement that she was not previously aware of Doe's HIV status.

Duncan also approached co-worker Ron Okes in what he characterized as an attempt to verify the rumor. Okes was a close friend of Doe, and Doe had previously told him in confidence that he was HIV positive. Okes did not confirm Duncan's gossip. A few days later, Duncan approached Okes again. She told him she had gone to Doe's significant other,[2] who was also a co-worker, and apologized for spreading the rumor.[3]

Doe and his significant other apparently complained to postal supervisors, and the Postal Service seems to have taken responsible action. According to Okes' testimony, the supervisors separately confronted Duncan and Logan Cameron about the incidents, perhaps in the presence of Doe and his partner. Duncan left her meeting in tears, and was ultimately transferred to a different work station.

Doe sued Duncan for invasion of privacy.[4] As damages, he alleged that he suffered "embarrassment, humiliation and mental distress." (R. at 19, 20, 21.) Doe did not allege any physical or economic injuries, nor did he file a claim of employment discrimination or harassment under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994) (prohibiting Postal Service from discriminating against qualified individuals with disabilities).[5]

---

1. Lizzie Cameron is identified in the record as "Jane."

2. The record refers to this individual as Doe's "roommate" but that characterization appears to be inadequate.

3. Other co-workers apparently learned Doe was HIV positive, but we may not reasonably infer from the designated evidence that Duncan told them. (R. at 164–65.)

4. Doe also sued Methodist Hospital and Lizzie Cameron for invasion of privacy and for violating statutory duties of confidentiality, *see* Ind.Code Ann. § 16–39–5–3(b) (West 1995) (formerly § 16–4–8–8; recodified 1993) (confidentiality of medical records); Ind.Code Ann. § 16–41–8–1(b) (West Supp.1997) (formerly § 16–1–9.5–7(b))(re-codified 1993) (confidentiality of records of communicable disease). Doe sued Logan Cameron for invasion of privacy. Methodist Hospital and Lizzie Cameron jointly moved for summary judgment, which the trial court denied. That ruling is not at issue on appeal. Logan Cameron's motion for summary judgment was still pending when Doe pursued this appeal.

5. HIV positive status may qualify as a disability under federal law. *See Gates v. Rowland*, 39 F.3d 1439 (9th Cir.1994); *Harris v. Thigpen*, 941 F.2d 1495, 1522–24 (11th Cir.1991); *Anderson v. Gus Mayer Boston Store*, 924 F.Supp. 763 (E.D.Tex.1996) (collecting cases). *But see Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55 (4th Cir.1995)(concluding HIV positive status not a disability *per se*). The condition

Duncan moved for summary judgment, which the trial court granted. Doe appealed, and the Court of Appeals affirmed. *Doe v. Methodist Hospital,* 639 N.E.2d 683 (Ind.Ct. App.1994). We granted Doe's petition for transfer, and now affirm the judgment of the trial court.

### I. The Disclosure Sub–Tort

The invasion of privacy tort had its genesis in an 1890 law review article by Boston attorney Samuel Warren and his former law partner—and future Supreme Court Justice—Louis Brandeis. *See generally* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy,* 4 Harv. L.Rev. 193 (1891). An impetus for it seems to have been the press's coverage of Warren's wife's social gatherings "in highly personal and embarrassing detail." William L. Prosser, *Privacy,* 48 Cal. L.Rev. 383, 383 (1960). The reports covering their daughter's wedding were apparently more than the Warrens' sensibilities could bear. *Id.* (the press "had a field day").

With the assistance of Brandeis, Warren set out to combat what he viewed as dangerous media excesses. The authors criticized the press for "overstepping in every direction the obvious bounds of propriety and decency." Warren & Brandeis, *supra,* at 196. They were concerned that truthful reporting about "private" affairs was causing "a lowering of social standards and of morality." *Id.* This agenda percolated with clarity beneath the cool analytical surface of the article. A cause of action for invasion of privacy would chill the press from reporting "unseemly gossip."

As Professor William Prosser later observed, the article "[p]iec[ed] together old decisions in which relief had been afforded on the basis of defamation, or the invasion of some property right, or a breach of confidence or an implied contract." Prosser, *supra,* at 384 (footnotes omitted). Warren and Brandeis argued that the old decisions could not satisfactorily be explained with reference to their stated legal bases. The authors contended that the allegedly aberrant deci-

sions should instead be understood as signaling the emergence of a new, if ill-defined, right to privacy. *Id.*

Courts did not rush to recognize the new privacy tort. The high courts of Michigan and New York expressly rejected it. *See Atkinson v. John E. Doherty & Co.,* 121 Mich. 372, 80 N.W. 285 (1899); *Roberson v. Rochester Folding Box Co.,* 171 N.Y. 538, 64 N.E. 442 (N.Y.1902). Judge O'Brien of the New York Court of Appeals felt so strongly about the issue he wrote a law review article defending the *Roberson* decision. *See generally* Denis O'Brien, *The Right of Privacy,* 2 Colum. L.Rev. 437 (1902). A few years later, however, the Georgia Supreme Court recognized the privacy tort. *See Pavesich v. New England Life Ins. Co.,* 122 Ga. 190, 50 S.E. 68 (1905). With the imprimatur of the first Restatement of Torts in the 1930s, the pace of recognition accelerated. *See* Restatement of Torts § 867 (1939); Prosser, *supra,* at 386.

Although Warren and Brandeis had written in terms of a comprehensive interest in privacy, the far-flung cases they cited never coalesced into a unified tort. The first Restatement managed to articulate a two-dimensional interest in "not having [one's] affairs known to others or [one's] likeness exhibited to the public." Restatement of Torts § 867. By 1960, Professor Prosser had concluded that invasion of privacy was "not one tort, but a complex of four." Prosser, *supra,* at 389.

The Second Restatement adopted this view, describing four distinct injuries: (1) intrusion upon seclusion, (2) appropriation of likeness, (3) public disclosure of private facts, and (4) false-light publicity. Restatement (Second) of Torts § 652A (1977). The Second Restatement also candidly acknowledged that these four separate wrongs were only tenuously related. They were united only in their common focus on some abstract notion of being left alone. *Id.* § 652A cmt b.

---

certainly affects a major life activity. *See* Ind. Code Ann. § 16–41–7–1 (West Supp.1996) (imposing upon persons with HIV a duty to warn past and present sexual partners of HIV status).

*But see Ennis,* 53 F.3d at 60 (HIV positive status without accompanying AIDS symptoms does not affect a major life activity).

■ Taken separately, each wrong more closely resembles other distinct torts, rather than separate branches of a single privacy tort. *See, e.g.,* Restatement of Torts § 867 cmt a. Often the privacy tort seems to function as little more than a "lite" version of trespass, outrage, or defamation—promising the same great take with only half the facts. *See, e.g., Lovgren v. Citizens First National Bank,* 126 Ill.2d 411, 128 Ill.Dec. 542, 546, 534 N.E.2d 987, 991 (1989) ("It has been said that all defamation cases can be analyzed as false-light cases, but not all false-light cases are defamation cases."). Moreover, recognizing one branch of the privacy tort does not entail recognizing all four. *See id.,* 128 Ill. Dec. at 544, 534 N.E.2d at 989 (accepting false light but declining to resolve appellate court disagreement over recognition of intrusion); *Zinda v. Louisiana Pacific Corp.,* 149 Wis.2d 913, 440 N.W.2d 548, 555 (1989) (observing that privacy statute includes intrusion, appropriation, and disclosure, but not false light).

The only branch of the privacy tort at issue in this case is disclosure. This cause of action has been recognized in most states, *see* Diane L. Zimmerman, *Requiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort,* 68 Cornell L.Rev. 291, 365–67 (1983), including each of Indiana's neighbors. *See Miller v. Motorola, Inc.,* 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900 (1990); *Brents v. Morgan,* 221 Ky. 765, 299 S.W. 967 (1927); *Beaumont v. Brown,* 401 Mich. 80, 257 N.W.2d 522 (1977), *overruled in part by Bradley v. Bd. of Educ.,* 455 Mich. 285, 565 N.E.2d 650 (1997) (Freedom of Information Act supercedes state employee's privacy right); *Housh v. Peth,* 165 Ohio St. 35, 133 N.E.2d 340 (1956). On the other hand, a few states have refused to recognize disclosure. *See Hall v. Post,* 323 N.C. 259, 372 S.E.2d 711 (1988); *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985); *Stubbs v. North Mem. Med. Ctr.,* 448 N.W.2d 78 (Minn.Ct.App. 1989). Even where the cause of action has been recognized, the success rate of plaintiffs has been extremely low, perhaps because of its stringent elements. Zimmerman, *supra,* at 293 & n. 5 (finding only 18 state cases in which plaintiff's claim succeeded or survived a motion for summary judgment or dismissal).

■ While we have recited the Second Restatement's four-part definition of the privacy tort, *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind.1991), we have never directly confronted disclosure as an actionable invasion of privacy. In *State ex rel. Mavity v. Tyndall,* 224 Ind. 364, 66 N.E.2d 755 (1946), we generally recognized breach of privacy as tortious. That decision, however, predated the Second Restatement and thus did not consider the different forms of invasion that courts have since delineated.

We think *Mavity* need not be read as a recognition of anything more than false light invasion of privacy. The plaintiff had been arrested and charged with gaming misdemeanors. The Indianapolis police took a "mug shot" of him, took his fingerprints, obtained a copy of his signature, and compiled a personal description of him. He was soon released after a hearing, and the charges were dropped. Mavity then sued, on invasion of privacy grounds, seeking the return or destruction of the items the police had collected. We held that retention of the materials could not invade his privacy as long as they were "filed away from public gaze." *Id.* at 382, 66 N.E.2d at 762. We did sanction enjoining the police department from placing Mavity's photograph in a "rogues' gallery," because such a display would imply that he was guilty of some offense and thus place him in a false light before the public. *Id.* at 381, 66 N.E.2d at 762.

Relying on *Mavity,* the Court of Appeals two years later acknowledged the theory of the disclosure sub-tort in *Patton v. Jacobs,* 118 Ind.App. 358, 364, 78 N.E.2d 789, 791 (1948), but held that it did not prevent a creditor from disclosing a debtor's financial status to the debtor's employer in an effort to collect on the debt from the debtor's wages. A year later, citing *Mavity* and *Patton,* the Court of Appeals defined the tort of invasion of privacy as

"The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrong-

ful intrusion into one's private activities, in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilit[ies]." *Continental Optical Co. v. Reed,* 119 Ind. App. 643, 648, 86 N.E.2d 306, 308 (1949) (quoting Annotation, *Right of Privacy,* 138, A.L.R. 22, 25 (1942)).

Consistent with the national trend, defendants in three of the four reported Indiana decisions involving disclosure since *Patton* were exonerated. *See Near East Side Community Org. v. Hair,* 555 N.E.2d 1324 (Ind. Ct.App.1990); *Indiana Nat'l Bank v. Chapman,* 482 N.E.2d 474 (Ind.Ct.App.1985); *Kaletha v. Bortz Elevator Co. Inc.,* 178 Ind.App. 654, 383 N.E.2d 1071 (1978). In the fourth case the court merely held that the plaintiff's claim against one of two defendants survived a motion for summary judgment. *Watters v. Dinn,* 633 N.E.2d 280 (Ind.Ct.App.1994), *trans. denied.*

In this case, Doe would have us impose upon Hoosiers a legal duty to refrain from publicly disclosing the private affairs of others. We can identify two main interests that such a duty would protect. First, a person has an interest in reputation, in being able to interact effectively with other people. Second, a person has an interest in mental well-being, in avoiding the emotional distress that could result from disclosures. Each of these interests must be balanced against competing public and private interests.

## A. Reputation

Under one view, the primary harm that can result from a public disclosure of private facts is an injury to a person's reputation. The Restatement explains that "[e]very individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye." Restatement (Second) of Torts § 652D cmt. b (1977). When someone else exposes those facts, the Restatement recognizes injury to reputation as the main compensable harm that can result. *See id.* § 652H cmt. a. This interest is important, but the Indiana Bill of

Rights weighs strongly against recognizing a civil action to protect it.

*1. The Interest in Reputation.* Some commentators have derided the reputational interest as an interest in cultivating a undeserved reputation. Judge Posner, for example, has declared that "we have no right, by controlling the information that is known about us to manipulate the opinions that other people hold of us." Richard A. Posner, *The Right of Privacy,* 12 Ga. L.Rev. 393, 408 (1978). In lauding gossip, another commentator has asserted that "the cohesiveness and durability of any social organization depends [*sic*] upon the ability of its members to evaluate each other accurately and to use their observations to exert, modify, or develop social controls." Zimmerman, *supra,* at 327.

Still, the reputational interest protected by disclosure actions should not be lightly dismissed. Truthful disclosures can be socially disruptive and personally dangerous. In many real-life situations, the maintenance of a social organization—such as a workplace— sometimes depends upon the ability of individuals to censor themselves and minimize internecine strife.

■ Moreover, while truthful disclosures can shatter undeserved reputations, they can also incite undeserved abuse. Defamation law has traditionally addressed similar injuries to reputation. According to Blackstone, for example, libel and slander actions protected individuals from social exclusion or impairment of livelihood. *See* 3 William Blackstone, Commentaries *123. This Court recognized 150 years ago that libelous defamation injured a person's reputation and thereby exposed him "to public hatred, contempt, or ridicule." *Armentrout v. Moranda,* 8 Blackf. 426, 427 (Ind.1847).[6] Today, the Second Restatement defines a defamatory communication as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of

---

6. Indeed, the Indiana Constitution's open courts provision specifically mentions injury to reputa-

tion. Ind. Const. art. I, § 12.

Torts § 559 (1977) (emphasis added). Unjustified ostracism is a central concern of libel and slander law.

■ Defamation rules apply, however, only to statements that are false as well as defamatory. *Id.* § 558. The common law refused to recognize that any unjustified harm could flow from derogatory statements that were true. *See* 3 Blackstone, *supra,* at *125; Francis Ludlow Holt, The Law of Libel 280 (1818) (observing that in truthful defamation "there can be no ... injurious damage," for "[t]he plaintiff has previously extinguished his own character"). The Restatement adheres to that policy, protecting truthful defamation from liability. Restatement (Second) of Torts § 581A. From the beginning, this Court has recognized truth as a complete defense in civil actions for libel or slander. *See, e.g., Henson v. Veatch,* 1 Blackf. 369, 372 n. 2 (Ind.1825). Dissemination of truthful but defamatory private facts has apparently never been civilly actionable as libel or slander in Indiana.

To the extent the disclosure sub-tort protects an interest in reputation, it fills this supposed gap, as truth is not a defense in a disclosure action. Indeed, one commentator largely attributes the emergence of the sub-tort to "the general common law defense of truth in civil defamation actions and the concomitant unavailability of a remedy thereunder for highly embarrassing truthful disclosures." David A. Elder, The Law of Privacy, § 3.1, at 149 (1991). In other words, disclosure sometimes serves as an alternative action for truthful defamation.

*2. Truthful Defamation.* That alternative feature of the disclosure sub-tort, however, brings it into potential conflict with the libel provision of the Indiana Bill of Rights: "In all prosecutions for libel, the truth of the matters alleged to be libelous may be given in justification." Ind. Const. art. I, § 10. The text of Section 10 is not lacking in ambiguity. Nevertheless, our review of its history suggests a very strong policy against

any civil liability based on truthful defamation.

Section 10 has a somewhat complicated etymology. It derived from a similar provision in the 1816 Constitution, which in turn had been borrowed from the Pennsylvania Constitution of 1790. The language was strongly influenced by the development of criminal libel law in Great Britain. That development was dominated by two related issues: (1) whether truth should be a defense in criminal libel and (2) whether the judge or the jury should determine whether a defendant's publication was unlawful. The controversy culminated in Fox's Libel Act in 1792, which inspired American constitutional provisions.

With the rise of the enlightenment in the sixteenth and seventeenth centuries, the English government increasingly used criminal libel law to suppress dissent. *See* John Kelly, *Criminal Libel and Free Speech,* 6 Kan. L.Rev. 295, 300–03 (1958); 2 James Fitzjames Stephen, A History of the Criminal Law of England 300–04, (1883). On the theory that truthful statements were at least as dangerous to public peace as false ones, the Star Chamber, and later the common law courts, abrogated the defense of truth in criminal libel.[7] Roy Robert Ray, *Truth: A Defense to Libel,* 16 Minn. L.Rev. 43, 44–46 (1931–32). Indeed, Lord Mansfield is usually credited with coining the infamous maxim, "The greater the truth, the greater the libel." *Id.* at 43 n. 1; John Townshend, Slander and Libel § 211, at 306 n. 4 (4th ed. 1890).

In the seventeenth and eighteenth centuries, common law courts also restricted the discretion of juries in criminal libel cases. Judges assumed the right to decide, as a matter of law, whether a defendant's publication was unlawfully defamatory or seditious. *See* Kelly, *supra,* at 302–03. The jury was responsible for deciding only discrete factual matters, such as whether it was the defendant who had actually published the alleged libel. *See* 2 Stephen, *supra,* at 303–04, 315. The jury was not supposed to return a gener-

---

7. Apparently, the common law had previously regarded falsity an element of the offense of criminal libel. Ray, *infra,* at 44 n. 3. Therefore, it is arguable that under Indiana's receptor stat-

ute, the removal of the truth defense at common law, which largely occurred after 1607, was never incorporated into the law of this State. Ind. Code Ann. § 1–1–2–1 (West 1981).

al verdict of guilt. *See id.* at 325. This division of responsibilities obviously granted judges tremendous power over criminal libel defendants.

Opponents of government suppression attempted to use juries to derail criminal libel prosecutions. These advocates convinced several juries in high-profile cases to return general verdicts of not guilty or verdicts of "guilty of publication only," which implied overall innocence. *See* 2 Stephen, *supra,* at 323, 325, 330. When these verdicts were challenged, the advocates attempted to transfer the question of a publication's libelous character from judge to jury by contending that a defendant could not be convicted without a jury finding of specific intent. *See* Kelly, *supra,* at 304. When Lord Mansfield rejected this argument and asserted that juries had no right to return a general verdict, *Rex v. Woodfall,* 20 State Tr. 895, 912–13 (1770), Parliament harshly criticized the result. 2 Stephen, *supra,* at 325.

When Lord Mansfield reaffirmed this view in another high-profile decision, *The Dean of Asaph's Case,* 21 How. St. Tr. 847, 1033–40 (K.B.1783), Parliament eventually responded with Fox's Libel Act, 32 Geo. 3, ch. 60 (1792). 2 Stephen, *supra* at 343. Although the Act is sometimes mistakenly cited as re-establishing the truth defense in criminal libel, Ray, *supra,* at 46, it actually addressed the role of juries. The Act authorized juries in criminal libel trials to return a general verdict of guilt, but it reserved the right of a judge to instruct the jury "in like manner as in other criminal cases." 2 Stephen, *supra,* at 344–45. Although Parliament did not officially restore the truth defense in criminal libel until 1843, Lord Campbell's Act, 6 & 7 Vic., ch. 96 (1843), the ability of a jury to acquit a defendant no doubt permitted an unofficial truth defense.

Fox's Libel Act left an ambiguous legacy. Because Lord Mansfield and other judges

had considered the defamatory character of a publication to be a question of law for the court, this statute expanding the authority of juries was said by some to have recognized the right of juries in criminal libel cases to decide questions of law as well as fact. Furthermore, the Act's suggestion that this power was like that "in all criminal cases" was taken as evidence that juries generally held the power to decide questions of law in criminal cases. *See* Mark DeWolfe Howe, *Juries as Judges in Criminal Law,* 52 Harv. L.Rev. 582, 585–86 (1939). Juries exercised that power in some of the American colonies, Note, *The Changing Role of the Jury in the Nineteenth Century,* 74 Yale L.J. 170, 173–74 (1964), and the policy reached an apex during the early nineteenth century. *See id.* at 174 (citing Howe, *supra* at 583–84). Fox's Libel Act came to symbolize the power of the jury to decide questions of law.[8]

This history guided the drafters of Indiana's 1816 Constitution. It contained a forerunner to our present Section 10, as follows:

> In prosecutions for the publication of papers investigating the official conduct of officers, or men in a public capacity, or where the matter published is proper for the public information, *the truth thereof may be given in evidence;* and in all indictments for libels, *the Jury shall have a right to determine the law and the facts,* under the direction of the Court, as in other cases.

Ind. Const. art. I, § 10 (1816) (emphasis added). This wording was taken almost verbatim from the 1790 Pennsylvania Constitution. Pa. Const. art. IX, § 7 (1790).[9]

The influence of the British experience is manifest. These provisions addressed both of the contemporary controversies in criminal libel law. In Britain, criminal libel became "almost exclusively" an instrument for the

---

8. In debating passage of the federal Sedition Act in 1798, 1 Stat. 596, the House of Representatives considered an amendment that would have explicitly recognized the right of a jury to determine the law as well as the facts in a sedition prosecution. The sponsor believed that libel law on that point was unsettled in the United States. Another member believed American juries already had the right to decide questions of law in

criminal trials. Still another member expressed the view that juries should not possess that power. *See* Howe, *supra,* at 586–87.

9. This provision was also adopted by Kentucky, Tennessee, and Ohio. Francis Ludlow Holt, The Law of Libel 47–48 n.(a) (1818).

suppression of political dissent. Kelly, *supra*, at 303. Perhaps the fear of a similar use of the law by elites in early Indiana led the framers of the 1816 Constitution to guarantee the availability of a truth defense where political speech was concerned. *See* C.A. Byers, *Growth of the Constitution of Indiana*, 6 The Indianian 276, 279–80 (1990) (contrasting populist principles that motivated framers of 1816 with the Federalist principles that motivated authors of the Northwest Ordinance).

In another reaction to the British experience, the framers gave juries in criminal libel cases "the right to determine the law and the facts." The 1816 provision was also phrased in such a way that, as with Fox's Libel Act, it could be read to imply that juries were generally empowered to decide questions of law in all criminal cases. Indeed, this Court specifically rejected the contention that Section 10 implied such a general power. *Townsend v. State*, 2 Blackf. 151, 157 (Ind.1828). Eight years later, however, the Court tersely held that a trial judge should have instructed the jury in a larceny case that it was the judge of the law as well as the facts. *Warren v. State*, 4 Blackf. 150, 150–51 (Ind. 1836).[10]

A key ambiguity is whether the framers of the 1816 provision intended to constitutionalize the truth defense in *civil* as well as criminal actions for libel. The provision made truth a defense in "prosecutions" for "publication of papers" involving specified political matters: essentially seditious libel. The jury clause, however, applied to "all indictments for libels." There are at least

two ways to interpret the differing language. First, the truth clause might have applied to both civil and criminal actions, while the jury clause applied only to criminal actions. Second, the truth clause might have applied to only criminal actions based on political libel, while the jury clause extended to all criminal libel, whether seditious or personal.

The second view seems more plausible for several reasons. First, the truth defense in civil actions for libel seems to have been well established at common law by the early nineteenth century. *See* Ray, *supra*, at 50; Thomas Starkie, A Treatise on the law of Slander and Libel *235 n. 1 (John L. Wendell ed. 1858). Second, the 1816 provision applied only to libel, not to slander, which was a civil action with no criminal counterpart. *See* 4 Blackstone, *supra*, at *149–52.[11] Third, an 1803 opinion of the Pennsylvania Supreme Court interpreting the parent provision of old § 10 suggests that the provision did not affect civil actions for libel, where truth was already established as a valid defense in all cases. *See Runkle v. Meyer*, 3 Yeates 518, 520 (Pa.1803).

The 1851 truth-in-libel provision seems to have been based largely on the 1816 provision. Construing this provision is difficult, however, because it existed in a contemporary vacuum. As noted above, this Court early on recognized the truth defense in civil actions for libel and slander, and the legislature codified that rule in 1852, 2 Ind.Rev. Stat. pt. 2, ch. 1, § 87 (1852).

Furthermore, at least by 1843 the legislature had abolished common law crimes, *see* Ind.Rev.Stat. ch. 54, § 84 (1843); *Beal v.*

---

**10.** Judge Blackford had dissented in *Townsend*, 2 Blackf. at 162–63, and was the only remaining member of the *Townsend* Court when *Warren* was decided. In *Carter v. State*, 2 Ind. 617 (1851), the Court upheld a instruction that told the jury members that although they were the judges of the law and the facts, "it was their duty to believe the law to be as laid down by the Court." *Id.* at 619. This Court later strongly disapproved of this instruction. *Lynch v. State*, 9 Ind. 541 (1857). For a detailed discussion of this history, see John F. Bodle, Note, *Indiana Juries in Criminal Cases as Judges of Law Under Constitutional Relic*, 24 Notre Dame Lawyer 365, 367 (1948–49); Carolyn White Spengler, Note, *The Jury's Role Under the Indiana Constitution*, 52 Ind. L.J. 793, 795–96 (1976–77).

**11.** Even if, as some commentators suggested, criminal slander existed at common law if the spoken words were seditious, *see* W. Blake Odgers, A Digest of The Law of Libel and Slander *4 (1st Amer. Ed. 1881); Francis Ludlow Holt, The Law of Libel 222 (1818), it seems clear that truth was a good defense in slander actions, Starkie, *supra* at *232. An alternative explanation might be that the 1816 framers understood seditious libel and slander to be criminally punishable at common law and intended the word "libel" in old Section 10 to include criminal prosecutions for seditious slander. In neither case would the truth clause in old Section 10 have necessarily extended to civil actions.

*State,* 15 Ind. 378, 379 (1860). Moreover, while Indiana statutes criminalized malicious prosecution, Ind.Rev.Stat. ch. 53, § 77, at 976 (1843), and barratry, *id.* § 78, at 976 (1843), no criminal statute prohibited libel or slander. The revision of Indiana statutes in 1852 did not alter this state of affairs. *See* 1 Ind.Rev.Stat. ch. 61, § 2, at 351 (1852) (abolishing common law crimes); 2 Ind.Rev.Stat. pt. 3, ch. 7, §§ 18, 19, at 463–64 (1852) (proscribing malicious prosecution and barratry).

Nevertheless, whether the framers of the 1851 Constitution intended the new Section 10 to guarantee a truth defense in civil as well as criminal actions for libel is open to doubt. The initial version of the 1851 provision, drafted by Robert Dale Owen's committee, appears as an edited version of the 1816 provision. It deleted the reference to political libel from the truth clause and made both clauses applicable to all libel "prosecutions":

> In all prosecutions for libel, the truth of the matter alleged to be libellous may be given in [sic] justification, and the jury shall have the right to determine the law and the facts.

*Journal of the Convention of the People of the State of Indiana to Amend the Constitution,* 187 (1851) [hereinafter *Journal* ]. This proposed wording bolsters our view that the 1816 truth clause applied only to criminal sedition, for Owen's edited version of it was obviously limited to criminal libel. This conclusion follows from the jury clause. There was no serious contention in the nineteenth

century that juries should be empowered to determine the law in civil cases. Thus, the word "prosecutions" in the Owen draft, and probably the 1816 provision, likely referred only to criminal prosecutions.

The Owen draft of Section 10, however, encountered opposition in the convention debates and was substantively amended. Delegate Henry F. Thornton recounted this Court's decisions in *Townsend* and *Warren* on the role of the jury in criminal cases, and expressed his concern that since juries could not determine the law in civil cases, Owen's proposed guarantee of a truth defense would be read to apply only to criminal cases. 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1850,* 1384 (1850) [hereinafter *Debates* ]. Thornton claimed to have "no doubt that the draftsman of this section, had it in view to make it cover *civil* as well as *criminal* cases." *Id.* Whether disingenuous rhetoric or honest mistake, Thornton was probably wrong about the scope of Owen's proposed language.[12] Nevertheless, he offered an amendment to ensure that § 10 guaranteed a truth defense in civil actions for libel, and the convention adopted the amendment. *Journal* at 579.[13]

When this language emerged from Owen's Committee on Revision, however, the amended Section 10 had become two separate sections of the Bill of Rights. One section guaranteed the truth defense in "all prosecutions

---

**12.** Thornton may have simply been mistaken. For example, as support of his proposal to constitutionalize the truth defense in civil cases, Thornton criticized the "monstrous doctrine" of Lord Mansfield ("The greater the truth, the greater the libel"). 2 *Debates* at 1389. As noted above, though, Mansfield had formulated that doctrine in the context of criminal libel, not civil libel, and this Court had long maintained that truth was a defense in civil libel.

On the other hand, Thornton also justified his proposal to guarantee the truth defense in civil actions by citing "[t]he whole current of the recent New York cases of libel, especially the Cooper cases." 2 *Debates* at 1389. In *Cooper v. Barber,* 24 Wend. 105 (N.Y.1840), the Court denied a new trial in a successful libel action by James Fenimore Cooper against a local newspaper publisher who had republished an article critical of him. The trial court had refused to allow the publisher to introduce in mitigation of

damages evidence that some, but not all, of the material had been truthful. The Court held that evidence was admissible in mitigation only if the evidence tended to show that the charge was false, not that the charge was true but partly justified. *Id.* at 108. Thornton clearly disapproved of this result and also thought a New York procedure statute, Act of April 12, 1848, ch. 379, § 142, 1848 N.Y. Laws 497, 524, had not adequately cured the problem. *See* 2 *Debates* at 1389. *See also* John Townshend, Slander and Libel § 409, at 674–77 (4th ed. 1890).

**13.** With Thornton's additions, the amended Section 10 read as follows:

> In all prosecutions for libel, *as well in criminal as in civil cases,* the truth of the matter alleged to be libelous may be given in justification; and the jury shall have the right *in all criminal cases* to determine the law and the facts.

*Journal* at 868 (emphasis added).

for libel," and the other granted juries the right to determine the law in all criminal cases, not just in libel cases. *See id.* at 872. Given the convention's approval of Thornton's amendment, the Owen revision is a mystery. At the least, one can say that the truth-in-libel provision of the 1851 Indiana Constitution commands real caution about proposals to recognize a civil cause of action for libel that impose liability for truthful statements.

### B. Emotional Health

There is a second interest that the public disclosure sub-tort protects, an interest in emotional health. Doe alleged that he suffered "embarrassment, humiliation, and mental distress" as a result of the disclosure of his HIV status. Warren and Brandeis, in fact, focused most of their attention in their article on these injuries, expressing a concern for "peace of mind" and the embittering of life. Warren & Brandeis, *supra,* at 200, 204.

Indiana law, however, already provides protection for emotional injuries with a civil action for intentional infliction of emotional distress, also known as "outrage." *Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind.1991). And *Dearborn Fabricating & Eng'g Corp., Inc. v. Wickham,* 551 N.E.2d 1135 (Ind.1990), teaches that we should consider whether emotional injuries resulting from public disclosures of private facts are sufficiently different from all other emotional injuries to justify special protection.

█ The issue is more than semantic. The tort of outrage contains more stringent proof requirements than does the disclosure sub-tort. To establish liability for outrage, a plaintiff must prove that a defendant (1) engaged in "extreme and outrageous" conduct that (2) intentionally or recklessly (3) caused (4) severe emotional distress. Restatement (Second) of Torts § 46 (1965).[14]

█ In contrast, under the Second Restatement a plaintiff does not have to prove

any mental element in a public disclosure action. He needs only to show that the disclosed matter was private and not of legitimate concern to the public, and that the disclosure would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652D (1977). In this sense, disclosure is a sort of strict liability version of outrage. It is outrage "lite."

At least one court has required plaintiffs in disclosure actions to establish the elements of outrage as well as disclosure. Writing for the Supreme Court of Oregon, Justice Hans Linde reasoned that disclosure should not be treated differently from other causes of action based on emotional injuries. *See Anderson v. Fisher Broadcasting Cos.,* 300 Or. 452, 712 P.2d 803, 807–14 (1986). Under the Oregon rule, a plaintiff has to prove that a defendant's disclosure was "designed to cause severe mental or emotional distress." *Id.,* 712 P.2d at 807; *cf. Taylor v. KTVB, Inc.,* 96 Idaho 202, 525 P.2d 984 (1974) (allowing disclosure action against media where matter was of legitimate public interest if defendant acted with malice). The Arizona Court of Appeals also adopted this standard in *Rutledge v. Phoenix Newspapers, Inc.,* 148 Ariz. 555, 715 P.2d 1243 (Ariz.Ct.App.1986). The Arizona Supreme Court subsequently overruled this more stringent standard, adopting the Second Restatement. *Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781 (1989).

Justice Linde seems right. Our opinion in *Collins v. Day,* 644 N.E.2d 72 (Ind.1994), suggests that in determining whether unequal treatment is justified in a given situation we should consider whether there are any "inherent differences" related to the subject matter at issue. *Id.* at 78. In this context, we would ask whether the two classes of emotional injuries exhibit any inherent difference with respect to either the ability of a plaintiff to prove the mode of their infliction or the justness of allowing a recovery. On this view, we cannot see any relevant difference between emotional injuries resulting from public disclosures of pri-

---

14. *Accord Doe v. Calumet City,* 161 Ill.2d 374, 204 Ill.Dec. 274, 282, 641 N.E.2d 498, 506 (1994); *Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 2–3 (Ky.1990); *Roberts v. Auto–Owners* *Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905, 908 (1985) (avoiding recognition of tort); *Yeager v. Local Union 20, Teamsters,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983).

vate facts and those arising from other sources.

Even under a broader analysis, we do not discern anything special about disclosure injuries. Perhaps Victorian sensibilities once provided a sound basis of distinction, but our more open and tolerant society has largely outgrown such a justification. In our "been there, done that" age of talk shows, tabloids, and twelve-step programs, public disclosures of private facts are far less likely to cause shock, offense, or emotional distress than at the time Warren and Brandeis wrote their famous article.

## II. Doe's Disclosure Claim

With these policies in mind, we turn to Doe's request that we recognize the sub-tort of disclosure, examining the facts and arguments advanced.

■■■ According to the Second Restatement, a person is subject to liability for public disclosure of private facts if the person (1) gives "publicity", (2) to a matter that (a) concerns the "private life" of another; (b) would be "highly offensive" to a reasonable person; and (c) is not of legitimate public concern. Restatement (Second) of Torts § 652D (1977). On appeal, Duncan argues that Doe's claim must fail with regard to Okes because of the "private life" element and with regard to Saunders because of the "publicity" element. We agree with both contentions.[15]

A key issue contested in the briefs is whether "publicity" requires disclosure to the general public or whether more isolated disclosures are also actionable. According to the Second Restatement, "publicity" in disclosure law is not the same as "publication" in defamation law. Restatement (Second) of Torts § 652D cmt. a. "Publication" can consist of communication to just one individual. *Id.* § 577(1). In contrast, "publicity" requires communication of the information "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* 652D cmt. a. A paradigmatic example is a creditor who posts in a shop window a sign declaring that a named individual owes him a certain sum of money, as in *Brents v. Morgan*, 221 Ky. 765, 299 S.W. 967 (1927).

The Restatement explicitly observes that communication "to a single person or even to a small group of persons" is not actionable. Restatement (Second) of Torts § 652D cmt. a; *see also* Elder, supra § 3:3, at 155–57 nn. 48–71 (1991 & Supp.1997) (collecting cases). Most courts have followed this definition of "publicity," see *id.* § 3:3, at 154, ignoring the Restatement's suggestion that courts could extend coverage "to a simple disclosure," Restatement (Second) of Torts § 652D cmt. a. *See, e.g., Kaletha v. Bortz Elevator Co., Inc.*, 178 Ind.App. 654, 383 N.E.2d 1071, 1075 (1978) (rejecting privacy claim in part because disclosure was not "directed toward the entire world"). Obviously, Duncan's two disclosures do not satisfy a requirement of dissemination to the general public.

On the other hand, a few courts, including Indiana's neighbors, have adopted a looser definition of "publicity." In the seminal *Beaumont* case, the Supreme Court of Michigan held that even if a disclosure were not made to the general public, it could still be actionable if made to a "particular public" with a special relationship to the plaintiff, such as co-workers, family members, or neighbors. *Id.* at 531. The court sought to identify a nexus between the information disclosed and the relationship between the plaintiff and the class to whom the disclosure was made. The question was whether a particular disclosure would be embarrassing given the plaintiff's relationship with the "particular public" at issue. In the most liberal application of *Beaumont*, the D.C. Circuit, applying a Kentucky privacy statute, held that disclosure of a person's infidelity to that person's spouse was actionable given the obvious detrimental impact that particular information could have on the intimate marital relationship. *McSurely v. McClellan*, 753 F.2d 88, 112–13 (D.C.Cir.), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985). Illinois Appellate Courts have followed *Beaumont*. *See, e.g., Miller v. Moto-*

15. The claim as to Okes fails because Doe had already told Okes of his HIV status.

*rola, Inc.*, 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900 (1990).

Even under the more flexible *Beaumont* standard, however, we conclude that Doe could not maintain a disclosure action against Duncan. Indeed, Doe could not sue Duncan based on her communications with Okes under any definition of "publicity" because Doe had already disclosed his HIV status to Okes. According to the Second Restatement, "[t]here is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public." Restatement (Second) of Torts § 652D cmt. b; *see also* Elder, *supra*, § 3:4 at 164–73 nn. 45–15 (collecting cases); *Near East Side Community Org. v. Hair*, 555 N.E.2d 1324, 1335 (Ind.Ct.App.1990) (holding disclosure claim not stated where information was matter of public record). Doe could hardly have been embarrassed and humiliated by Duncan's attempted disclosure to Okes of information Doe had already disclosed to him.[16]

In addition, Duncan's disclosure to Saunders, without more, cannot form the basis of a disclosure action even under the *Beaumont* doctrine. To designate a person or a group of persons as a "particular public," that person or persons must have a special relationship with the plaintiff such that the disclosure would be particularly damaging. Here, Doe had withheld his HIV status from a number of employees at the large postal branch where he worked. Of these uninformed co-workers, the evidence does not support an inference that Duncan told anyone but Saunders, another letter carrier. Thus, *Beaumont* would be applicable only if there were some special relationship between Doe and Saunders that justified treating her alone as a "particular public." Unlike the marital relationship in *McSurely*, however, nothing in the record indicates that knowledge of Doe's HIV status would be more relevant or damaging to his relationship with Saunders than with any of the other letter carriers. There is simply no basis for narrowing the definition of "particular public"

from the set of all Doe's letter-carrier colleagues to just Saunders.

## Conclusion

Indiana recognizes a number of the claims described generically as invasions of privacy. The version of these torts involving disclosure of truthful but private facts encounters a considerable obstacle in the truth-in-defense provisions of the Indiana Constitution. The facts and the complaint in this particular case do not persuade us to endorse the sub-tort of disclosure.

We affirm the trial court.

SELBY, J., concurs.

BOEHM, J., concurs in result without separate opinion.

DICKSON, J., concurs in result with separate opinion, in which SULLIVAN, J., concurs.

DICKSON, Justice, concurring in result.

I agree with the plurality's conclusion that, applying RESTATEMENT OF TORTS (SECOND) § 652D (1977), and construing the facts favorable to Doe, summary judgment was appropriate against Doe's claim for invasion of privacy for the disclosure of private facts, due to the failure to show the requisite "publicity." However, I believe that the plurality opinion is mistaken in its discourse questioning the cognizability of this tort under Indiana law. I base this disagreement upon four grounds: (1) the issue was not raised by the parties; (2) the tort of public disclosure of private facts is clearly established in Indiana jurisprudence; (3) the provisions of the Indiana Constitution do not undermine, but rather support, the right to a remedy for this form of invasion of privacy; and (4) our common law recognizing this tort reflects sound public policy.

With its discussion regarding the general cognizability of an action for public disclosure of private facts, the plurality ventures into an issue not presented by the parties. The defendant asserts on appeal and transfer

---

**16.** Even if Duncan had the burden of proving this point as an affirmative defense, she met the burden, as Doe has essentially conceded this fact.

only that there was insufficient "publicity" in the present case to constitute the invasion of privacy disclosure subtort. She does not question whether the tort is cognizable in Indiana. To the contrary, she expressly acknowledges that it is. Brief of Appellee at 11; Appellee's Brief in Opposition to Petition to Transfer at 8. It would seem preferable for this Court to address the issue only if raised and briefed by the parties.

Portraying it as an unresolved, new issue of law, the plurality casts the question as whether the tort of public disclosure of private facts "may form the basis of a civil action in Indiana," op. at 682, and asserts that the plaintiff "would have us impose upon Hoosiers a legal duty to refrain from publicly disclosing the private affairs of others." Op. at 686. I disagree with this characterization. For almost half a century, Indiana courts have clearly recognized the common law tort of invasion of privacy, including the unwarranted public disclosure of private matters.

In 1949, the Court of Appeals approved the following definition of the tort of invasion of privacy:

The unwarranted appropriation or exploitation of one's personality, *the publicizing of one's private affairs with which the public has no legitimate concern,* or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibility.

*Continental Optical Co. v. Reed,* 119 Ind. App. 643, 648, 86 N.E.2d 306, 308 (1949), *trans. denied.*

In *Cullison v. Medley,* 570 N.E.2d 27 (Ind. 1991), this Court stated, "The tort of invasion of privacy encompasses four separate forms; viz, appropriation, intrusion, *public disclosure of private facts,* and false light in the public eye." *Id.* at 31 (emphasis supplied). A claim of invasion of privacy for public disclosure of private facts was recently permitted to proceed to trial, reversing a summary judgment, in *Watters v. Dinn,* 633 N.E.2d 280 (Ind.Ct.App.1994), *trans. denied,* wherein the court stated:

Based upon our review of prior Indiana decisions and other authorities, three es-

sential elements of invasion of privacy by public disclosure of private facts emerge: (1) information is divulged to one who had no legitimate interest in the information; (2) in a manner that was coercive and oppressive; and (3) which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

*Id.* at 290.

Numerous other decisions have acknowledged the availability of the public disclosure tort. *See, e.g., Ellis v. Luxbury Hotels, Inc.,* 666 N.E.2d 1262, 1267 (Ind.Ct.App.1996), *trans. pending; Terrell v. Rowsey,* 647 N.E.2d 662, 667 (Ind.Ct.App.1995), *trans. denied; Near East Side Community Org. v. Hair,* 555 N.E.2d 1324, 1334–35 (Ind.Ct.App. 1990). The availability of an action for this tort was also recognized in *Indiana Nat'l Bank v. Chapman,* 482 N.E.2d 474, 479 (Ind. Ct.App.1985), but the court found the evidence wanting, stating, "To reiterate, the Bank's communication was in answer to a legitimate investigation by law enforcement and was not a 'publicizing of one's private affairs with which the public has no legitimate concern....'" *Id.* (citation omitted). Similarly, in *Short v. Haywood Printing Co., Inc.,* 667 N.E.2d 209 (Ind.Ct.App.1996), *trans. denied,* the court recognized that a plaintiff could prevail in proving the elements of disclosure of private information as an invasion of privacy, but found that the plaintiff failed to assert facts showing that any private information was divulged. *Id.* at 213–214. The public disclosure tort was extensively analyzed, particularly as to its "legitimate public interest element," in *Nobles v. Cartwright,* 659 N.E.2d 1064, 1074–77 (Ind. Ct.App.1995), which unequivocally declared, "Indiana recognizes the tort of public disclosure of private facts." *Id.* at 1073.

The tort of invasion of privacy by the public disclosure of private facts is clearly established in Indiana jurisprudence. I believe that it is a mistake to view the existence of this tort as a new question of law for this Court.

I also disagree with the plurality's conclusion that the Indiana Constitution may present a considerable obstacle to the tort of

public disclosure of truthful, private facts. To the contrary, our constitution provides a strong basis for continuing to recognize this tort.

As noted by the plurality, a primary harm that can result from a public disclosure of private facts is an injury to a person's reputation. The Indiana Constitution provides express recognition of an individual's interest in reputation and accords it specific protection. *Bals v. Verduzco*, 600 N.E.2d 1353, 1355 (Ind.1992). It expresses distinct protection for personal reputation: "[E]very person, for injury done to him in his person, property, or *reputation*, shall have remedy by due course of law." IND. CONST. art. 1, § 12 (emphasis added).[17] Furthermore, the provision protecting the "right to speak, write, or print, freely, on any subject whatever" is expressly qualified by the limitation "but for the abuse of that right, every person shall be responsible." IND. CONST. art. 1, § 9. While the framers were concerned that the defense of truth be permitted in prosecutions for libel, *e.g.*, defamatory *falsehoods*, it does not follow that they would have intended to prohibit accountability for harm resulting from the unwarranted public disclosure of private facts, albeit truthful disclosures.

Suggesting that *Collins v. Day*, 644 N.E.2d 72 (Ind.1994), applies, the plurality does not discern any relevant differences between emotional injuries resulting from public disclosures of private facts and those arising from other sources. However, this analysis fails to include consideration of the injury to one's reputation interest which accompanies the public disclosure tort. This harm to reputation component provides the inherent difference between the two classes of emotional injuries.

Contrary to the implication presented by the plurality, the Indiana Constitution does not appear to create any impediment to the cognizability of the common law tort of invasion of privacy by public disclosure of private facts.

I read the plurality opinion as inviting retreat from the common law recognition of the tort of invasion of privacy, particularly as to the public disclosure of private facts. As noted above, the availability of this theory of tort liability has been repeatedly acknowledged in numerous Indiana cases for almost fifty years. With our ever-increasing population and the growing technological opportunities for invasive scrutiny into others' lives, the compilation of private data, and the disclosure of purely personal matters, this common law tort grows in importance as a valuable source of deterrence and accountability.

Noting the prevalence of talk shows and tabloids, the plurality opines that in today's society, public disclosures of private facts are less likely to cause shock, offense, or emotional distress than in previous times. Despite the ebb and flow of cultural sensibilities, however, it seems unwise to base Indiana's common law jurisprudence on the common denominator of tabloid and talk show sensationalism and the related absence of traditional respect for privacy and reputation that often characterize these phenomena. The mere fact that some small segments of society might choose to publicly disclose intimate personal facts regarding themselves or others does not establish that this conduct is necessarily reasonable, appropriate, and generally expected behavior. Such concerns, in my view, do not justify the abrogation of the tort of public disclosure of private facts.

In the present case, the Court of Appeals noted that Indiana has long recognized the tort of invasion of privacy, including the unwarranted publicizing of another's private affairs, and it noted that this case presented a new question only as to what constitutes the element of "publicity" for this tort. It determined that the facts of this case did not establish "publicity." This likewise appears to be the actual holding of the plurality opinion of this Court. I believe that transfer should have been denied or the decision of Court of Appeals summarily affirmed.

SULLIVAN, J., concurs.

---

**17.** This language is almost the same as that used in its predecessor, Article 1, Section 11 of the Indiana Constitution of 1816 ("[E]very person, for an injury done him, in his lands, goods, person, or *reputation*, shall have remedy by the due course of law; ...") (emphasis added).